# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UPMC Pinnacle; UPMC Pinnacle Hospitals; UPMC Pinnacle Carlisle; UPMC Pinnacle Hanover; UPMC Pinnacle Lititz; UPMC Pinnacle Memorial; UPMC Somerset; UPMC Health Plan, Inc.; UPMC Health Coverage, Inc.; UPMC Health Network, Inc.; UPMC Health Options, Inc.; UPMC Benefit Management Services, Inc., | Class Action<br><br>Civil Action No.<br><br>Electronically Filed |
|       Plaintiffs, on their own and on behalf of all others similarly situated, | |
|    v. | |
| Joshua D. Shapiro, in his official capacity as Attorney General of the Commonwealth of Pennsylvania, | |
|       Defendant. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS'**
**<u>MOTION FOR PRELIMINARY INJUNCTION</u>**

# TABLE OF CONTENTS

Page

BACKGROUND .................................................................................................... 4

I.    Federal Law Governs Medicare And Self-Insured Plans. ..................... 4

II.   The Attorney General Has Taken Over Federal Healthcare Programs................. 6

III.  Plaintiffs Need Immediate Relief From The Attorney General's New Requirements. ...................................................................................... 8

ARGUMENT ........................................................................................................ 10

I.    Plaintiffs Have A Reasonable Probability Of Success On The Merits. ............... 11

    A.   The Attorney General's Takeover Of Federal Healthcare Programs Is Preempted By The Medicare Act. ............................ 11

        1.   Federal law expressly prohibits interference with MA contracting and price structures. ................................... 12

        2.   The Attorney General cannot displace out-of-network rates set by Congress. ...................................................... 15

        3.   The Attorney General seeks to take from CMS regulation of MA advertising. ........................................ 15

    B.   The ACA Preempts General Shapiro From Discriminating Against Nonprofit Health Plans. ............................................. 16

    C.   The Attorney General's Takeover Of The Nonprofit Healthcare Sector Is Preempted By ERISA. ............................... 18

    D.   The Attorney General's Mandates Constitute Unreasonable Restraints of Trade In Violation Of Section 1 Of The Sherman Act. ....... 22

        1.   The Attorney General's dictates are not protected by state-action immunity. ...................................................... 23

        2.   The Attorney General's dictates are anti-competitive. ................ 25

    E.   The Attorney General's Takeover Of Pennsylvania Nonprofits Violates The United States Constitution................................ 31

        1.   The Attorney General's rule by fiat does not provide any procedure consistent with due process........................ 31

        2.   The Attorney General's arbitrary and irrational requirements violate substantive due process. ........................... 36

        3.   The Attorney General's forced contracting violates the unconstitutional conditions doctrine. .......................... 40

        4.   The Attorney General's *ad hoc a*pproach to regulation violates equal protection. .......................................... 43

i

### <u>TABLE OF CONTENTS</u>
(continued)

**Page**

II.    Plaintiffs Will Suffer Irreparable Injury In The Absence Of An Injunction........ 45

III.   All Other Factors Favor Injunctive Relief. ......................................................... 48

      A.    The Balance Of Hardships Favors An Injunction................................... 48

      B.    An Injunction Is In The Public Interest.................................................... 49

CONCLUSION................................................................................................................ 50

# TABLE OF AUTHORITIES

Page(s)

CASES

*324 Liquor Corp. v. Duffy*,
479 U.S. 335 (1987)...........................................................................................23

*A.D. Bedell Wholesale Co. v. Philip Morris Inc.*,
263 F.3d 239 (3d Cir. 2001)...........................................................................23, 24

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000)....................................................................................3

*Aetna Life Ins. Co. v. Borges*,
869 F.2d 142 (2d Cir. 1989).................................................................................21

*Alessi v. Raybestos-Manhattan, Inc.*,
451 U.S. 504 (1981).......................................................................................19, 22

*Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty.*,
488 U.S. 336 (1989).............................................................................................44

*Anheuser-Busch, Inc. vs. Goodman*, 745 F. Supp. 1048 (M.D. Pa. 1990)..............................29, 30

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*,
793 F.3d 313 (3d Cir. 2015)...................................................................................10

*Baraka v. McGreevey*,
481 F.3d 187 (3d Cir. 2007)...................................................................................32

*Baskin v. Bogan*,
12 F. Supp. 3d 1137 (S.D. Ind. 2014)...................................................................46

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972).............................................................................................36

*Bracco Diagnostics, Inc. v. Shalala*,
963 F. Supp. 20 (D.D.C. 1997)............................................................................47

*Cal. Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.*,
445 U.S. 97 (1980).................................................................................23, 24, 25

iii

## TABLE OF AUTHORITIES
(continued)

*Carter v. Carter Coal Co.*,
    298 U.S. 238 (1936)....................................................................................................34

*Chainey v. St.*,
    523 F.3d 200 (3d Cir. 2008).......................................................................................36

*Chicago United Indus., Ltd. v. City of Chicago*,
    669 F.3d 847 (7th Cir. 2012) ......................................................................................36

*Cienega Gardens v. United States*,
    331 F.3d 1319 (Fed. Cir. 2003)...........................................................................42, 43

*CIGNA Healthplan of La., Inc. v. State of La. ex rel. Ieyoub*,
    82 F.3d 642 (5th Cir. 1996) ........................................................................................20

*City of Lafayette, La. v. Louisiana Power & Light Co.*,
    435 U.S. 389 (1978)....................................................................................................23

*City of Philadelphia v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Pa. 2017), *appeal dismissed*, 2018 WL 3475491
    (3d Cir. July 6, 2018) ..................................................................................................46

*Clay v. Permanente Med. Grp., Inc.*,
    540 F. Supp. 2d 1101 (N.D. Cal. 2007) .....................................................................15

*Cmty. Commc'ns Co. v. City of Boulder, Colo.*,
    485 F. Supp. 1035 (D. Colo.), *rev'd*, 630 F.2d 704 (10th Cir. 1980), *rev'd*, 455
    U.S. 40 (1982)............................................................................................................30

*Cmty. Health Partners, Inc. v. Com. of Ky.*,
    14 F. Supp. 2d 991 (W.D. Ky. 1998)..........................................................................20

*Coal. of N.J. Sportsmen v. Florio*,
    744 F. Supp. 602 (D.N.J. 1990) .................................................................................49

*Costco Wholesale Corp. v. Maleng*,
    522 F.3d 874 (9th Cir. 2008) ......................................................................................29

*Ctr. for Powell Crossing, LLC v. City of Powell*,
    173 F. Supp. 3d 639 (S.D. Ohio 2016) ......................................................................34

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Cty. Concrete Corp. v. Town of Roxbury*,
  442 F.3d 159 (3d Cir. 2006)...................................................................................36

*Dennis v. DeJong*,
  867 F. Supp. 2d 588 (E.D. Pa. 2011) ..................................................................32

*Dep't of Transp. v. Ass'n of Am. R.R.*,
  135 S. Ct 1225 (2015)..........................................................................................35

*Do Sung Uhm v. Humana, Inc.*,
  620 F.3d 1134 (9th Cir. 2010) .......................................................................12, 13

*Dolan v. City of Tigard*,
  512 U.S. 374 (1994)..................................................................................40, 41, 42

*F.T.C. v. Phoebe Putney Health Sys., Inc.*,
  568 U.S. 216 (2013)..............................................................................................23

*Fabian v. Metzko*,
  344 A.2d 569 (Pa. Super. Ct. 1975) ..................................................................8, 26

*FMC Corp. v. Holliday*,
  498 U.S. 52 (1990)............................................................................................6, 21

*Ford Motor Co. v. Ins. Com'r*,
  874 F.2d 926 (3d Cir. 1989).................................................................................50

*Freedom Holdings, Inc. v. Spitzer*,
  357 F.3d 205 (2d Cir. 2004).................................................................................23

*FTC v. Penn State Hershey Med. Ctr.*,
  838 F.3d 327 (3d Cir. 2016).................................................................................38

*FTC v. Ticor Title Ins. Co.*,
  504 U.S. 621 (1992)..............................................................................................23

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
  505 U.S. 88 (1992)................................................................................................18

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Garris v. Hanover Ins. Co.*,
 630 F.2d 1001 (4th Cir. 1980) ..............................................................32

*Geinosky v. City of Chicago*,
 675 F.3d 743 (7th Cir. 2012) ................................................................45

*Gen. Elec. Co. v. New York State Dep't of Labor*,
 936 F.2d 1448 (2d Cir. 1991).................................................................34

*Gobeille v. Liberty Mut. Ins. Co.*,
 136 S. Ct. 936 (2016).............................................................................21

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972)...............................................................................31

*Hi Tech Trans, LLC v. New Jersey*,
 382 F.3d 295 (3d Cir. 2004)...................................................................50

*Huntleigh USA Corp. v. United States*,
 63 Fed. Cl. 440 (2005) ...........................................................................43

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
 685 F.3d 353 (3d Cir. 2012)...................................................................11

*Intervest Fin. Servs., Inc. v. S.G. Cowen Sec. Corp.*,
 206 F. Supp. 2d 702 (E.D. Pa. 2002), *aff'd sub nom. InterVest, Inc. v.
 Bloomberg, L.P.*, 340 F.3d 144 (3d Cir. 2003) ......................................26

*Isbell v. Bellino*,
 962 F. Supp. 2d 738 (M.D. Pa. 2013) ....................................................33

*Kedra v. Schroeter*,
 876 F.3d 424 (3d Cir. 2017)...................................................................36

*Kennecott Corp. v. Smith*,
 637 F.2d 181 (3d Cir. 1980)...................................................................49

*Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*,
 37 F.3d 945 (3d Cir. 1994).....................................................................21

**TABLE OF AUTHORITIES**
(continued)

*King Drug Co. of Florence v. Smithkline Beecham Corp.*,
    791 F.3d 388 (3d Cir. 2015)........................................................................25

*Knudsen Corp. v. Nevada State Dairy Comm'n*,
    676 F.2d 374 (9th Cir. 1982) ......................................................................31

*Kolender v. Lawson*,
    461 U.S. 352 (1983)....................................................................................32

*Koontz v. St. John's River Water Management Dist.*,
    570 U.S. 595 (2013)..............................................................................40, 42

*Ky. Ass'n of Health Plans, Inc. v. Nichols*,
    227 F.3d 352 (6th Cir. 2000), *aff'd sub nom. Ky. Ass'n of Health Plans, Inc. v.*
    *Miller*, 538 U.S. 329 (2003)...................................................................20, 21

*La. Pac. Corp. v. Beazer Materials & Servs., Inc.*,
    842 F. Supp. 1243 (E.D. Cal. 1994)............................................................40

*La. Seafood Mgm't Council, Inc. v. Foster*,
    917 F. Supp. 439 (E.D. La. 1996)...............................................................45

*Lewis v. Del. State College*,
    455 F. Supp. 239 (D. Del. 1978)................................................................46

*Massachusetts Ass'n of HMOs v. Ruthardt*,
    194 F.3d 176 (1st Cir. 1999)......................................................................13

*Meek-Horton v. Trover Sols., Inc.*,
    915 F. Supp. 2d 486 (S.D.N.Y. 2013).........................................................13

*Metro. Life Ins. Co. v. Massachusetts*,
    471 U.S. 724 (1985)................................................................................5, 19

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)....................................................................................46

*Morrison v. Health Plan of Nev., Inc.*,
    328 P.3d 1165 (Nev. 2014).........................................................................13

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*N. California Power Agency v. Morton,*
396 F. Supp. 1187 (D.D.C. 1975) ..........................................32, 33, 34

*N. Pa. Legal Svcs., Inc. v. County of Lackawanna,*
513 F. Supp. 678 (M.D. Pa. 1981) .....................................................45

*N.J. Retail Merchants Ass'n v. Sidamon-Eristoff,*
669 F.3d 374 (3d Cir. 2012).........................................................47, 49

*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
514 U.S. 645 (1995)....................................................................19, 22

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ..........................................................................16

*NCAA v. Christie,*
926 F. Supp. 2d 551 (D.N.J. 2013) ...............................................45, 49

*New Hampshire v. Maine,*
532 U.S. 742 (2001).....................................................................27, 39

*NJ Primary Care Ass'n Inc. v. NJ Dep't of Human Servs.,*
722 F.3d 527 (3d Cir. 2013).............................................................35

*Nollan v. California Coastal Commission,*
483 U.S. 825 (1987)................................................................40, 41, 42

*Norman's on the Waterfront, Inc. v. Wheatley,*
444 F.2d 1011 (3d Cir. 1971)...........................................................24

*Ohio v. Am. Express Co.,*
310 U.S. 150 (1940).........................................................................30

*Pacific Bell Telephone Co. v. Linkline Communications, Inc.,*
555 U.S. 438 (2009).........................................................................26

*Pacificare of Nev., Inc. v. Rogers,*
266 P.3d 596 (Nev. 2011)................................................................13

TABLE OF AUTHORITIES
(continued)

Page(s)

*Patrick v. Burget,*
486 U.S. 94 (1988)..................................................................................................25

*Penn Central Transp. Co. v. New York City,*
438 U.S. 104 (1978)..............................................................................................42

*Phila. Cty. Med. Soc. v. Kaiser,*
699 A.2d 800 (Pa. Commw. Ct. 1997) ................................................................33

*Phillips v. Kaiser Found. Health Plan, Inc.,*
953 F. Supp. 2d 1078 (N.D. Cal. 2011) ..............................................................16

*Reilly v. City of Harrisburg,*
858 F.3d 173 (3d Cir. 2017)..................................................................................11

*Rosario–Cordero v. Crowley Towing & Transp. Co.,*
46 F.3d 120 (1st Cir. 1995)...................................................................................22

*Ross v. City of Berkeley,*
655 F. Supp. 820 (N.D. Cal. 1987) ......................................................................32

*Scarano v. Cent. R. Co. of N. J.,*
203 F.2d 510 (3d Cir. 1953)..................................................................................39

*Southersby Dev. Corp. v. Borough of Jefferson Hills,*
852 F. Supp. 2d 616 (W.D. Pa. 2012)..............................................................44, 45

*St. Louis Effort for AIDS v. Huff,*
782 F.3d 1016 (8th Cir. 2015) ..........................................................................5, 17

*Stephens v. Cty. of Albemarle,*
No. 04-cv-81, 2005 WL 3533428 (W.D. Va. Dec. 22, 2005)...............................40

*Teladoc, Inc. v. Texas Med. Bd.,*
112 F. Supp. 3d 529 (W.D. Tex. 2015).................................................................30

*Temple Univ. v. White,*
941 F.2d 201 (3d Cir. 1991)..................................................................................47

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Texas v. United States*,
　　300 F. Supp. 3d 810 (N.D. Tex. 2018) ...................................................34

*TFWS, Inc. v. Schafer*,
　　242 F.3d 198 (4th Cir. 2001) ..............................................................23

*Torretti v. Main Line Hospitals, Inc.*,
　　580 F.3d 168 (3d Cir. 2009).............................................................8, 41

*United States v. Colgate & Co.*,
　　250 U.S. 300 (1919)......................................................................25, 26

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*,
　　540 U.S. 398 (2004).............................................................................25

*Vill. of Willowbrook v. Olech*,
　　528 U.S. 562 (2000).............................................................................44

*West Penn Allegheny Health Sys., Inc. v. UPMC*,
　　627 F.3d 85 (3d Cir. 2010)..................................................................28

*Youngstown Sheet & Tube Co. v. Sawyer*,
　　343 U.S. 579 (1952)............................................................................31

**STATUTES**

40 Pa. Stat. Ann. § 764a......................................................................41

40 Pa. Stat. Ann. § 991.2116 ...............................................................41

40 Pa. Stat. Ann. § 991.2703 ...............................................................41

29 U.S.C. § 1144(a)........................................................................5, 19, 20

29 U.S.C. § 1144(c)(1)..........................................................................19

42 U.S.C. 1395w-21(h)(2) ....................................................................15

42 U.S.C. § 1395w-22(k)(1) .................................................................15

42 U.S.C. § 1395w-24(a)(6)(B)(iii) ............................................4, 13, 14

**TABLE OF AUTHORITIES**
(continued)

Page(s)

42 U.S.C. § 1395w-26(b)(3) ..................................................................................5, 12

42 U.S.C. § 1395w-26(b)(3) .........................................................................................15

42 U.S.C. § 18012 ....................................................................................................5, 18

42 U.S.C. § 18031(b) ....................................................................................................16

42 U.S.C. § 18031(c)(1) ...............................................................................................17

42 U.S.C. § 18041(c)(1) ...............................................................................................16

42 U.S.C. § 18041(d) ........................................................................................5, 17, 18

**OTHER AUTHORITIES**

42 C.F.R. § 413.65 ..................................................................................................14, 15

42 C.F.R. § 422.214 .....................................................................................................15

42 C.F.R. § 422.256(a)(2) .............................................................................................13

42 C.F.R. § 422.402 .....................................................................................................12

73 Fed. Reg. 28556-01 (May 16, 2008) .......................................................................15

Bruce W. Karrh, *Health Care Reform in the United States*, 13 Del. Law. 17
(1995) ......................................................................................................................20

David L. Meyer & Charles F. Rule, *Health Care Collaboration Does Not Require
Substantive Antitrust Reform*, 29 Wake Forest L. Rev. 169, 179–81 (1994) ..........20

H.R. Rep. No. 108-391 (2003) .....................................................................................12

H.R. Rep. No. 111-443, pt. 1 (2010) ............................................................................17

HB 1621 and HB 1622 (2013) ........................................................................................8

House Conf. Rep. No. 105-217 (1997) .........................................................................11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

John E. Lopatka & William H. Page, *State Action and the Meaning of Agreement Under the Sherman Act: An Approach to Hybrid Restraints*, 20 Yale J. On Reg. 269, 311 (2003) ................................................................................................29

Larry J. Pittman, *"Any Willing Provider" Laws and ERISA's Saving Clause: A New Solution for an Old Problem*, 64 Tenn. L. Rev. 409, 427–28 (1997) .............................20

Managed Care: State Regulation Can Control Perverse Capitation Incentives, Health Care Daily (BNA) (Feb. 15, 1996) ...............................................................20

U.S. Constitution, Fifth Amendment ............................................................................42

U.S. Constitution, Eleventh Amendment ......................................................................47

U.S. Constitution, Fourteenth Amendment ...........................................................31, 44

Plaintiffs filed suit to clarify their rights and obligations with respect to several federal health insurance programs. Preliminary relief is needed to prevent the Pennsylvania Attorney General's unlawful and unprecedented actions from irreparably harming Plaintiffs as they approach critical deadlines set by federal regulators. The Attorney General has imposed by fiat broad new requirements for the Commonwealth's nonprofit healthcare entities, under which they will be stripped of their federal rights and forced into involuntary contracts to provide their services at rates set by panels of self-interested and unaccountable arbitrators. These requirements directly conflict with federal statutes and regulations, placing Plaintiffs in the untenable position of being subject to two contradictory regulatory regimes.

Plaintiffs are likely to prevail on their legal challenges to the Attorney General's decree. Relevant to this motion, the Attorney General's regime of involuntary contracts is preempted by federal law in several key respects: Statutes creating the Medicare Advantage program—a markets-based alternative to traditional Medicare—explicitly favor competition, preserve health entities' freedom of contract, and preempt all state actions that interfere with the program. The Patient Protection and Affordable Care Act ("ACA") preempts any state regulatory action that discriminates against nonprofit health plans. The Employee Retirement Income Security Act of 1974 ("ERISA") supersedes state health care initiatives that substantially impact employer-sponsored health plans. These federal laws apply to Plaintiffs' businesses and bar the Attorney General's new rules.

The Attorney General's mandates also constitute unreasonable restraints of trade in violation of Section 1 of the Sherman Act. His new requirements are neither clearly articulated nor affirmatively expressed in any state policy, and would allow private, self-interested parties to dictate reimbursement rates throughout the Commonwealth. They do not, therefore, qualify for

state action immunity from federal antitrust laws. As repeatedly recognized by government authorities—including the Attorney General's office itself—the new requirements are anti-competitive and fundamentally at odds with longstanding antitrust and competition principles. His new regime will, among other things, stabilize prices and insulate prices from the free market, thereby removing incentives for market participants to compete on non-price factors; artificially depress reimbursement rates to providers, thereby sacrificing quality and access to care, stifling innovation and investment in state-of-the art facilities and technologies, and endangering charitable missions; and otherwise skew free bargaining and ordinary negotiation dynamics in anti-competitive ways.

The Attorney General's rules also violate the United States Constitution. Due process prohibits the Attorney General from imposing his *ultra vires* requirements on nonprofits through backroom threats with no legal process and then delegating price fixing power to self-interested private parties. Due process further prohibits the Attorney General from employing arbitrary, and irrational new standards that irreconcilably conflict with the position the Attorney General took before this very Court and before the Pennsylvania House of Representatives on the very same issues. The Takings Clause prohibits both unilaterally depriving Plaintiffs of their federal right not to contract, and conditioning state benefits, such as nonprofit status, on Plaintiffs giving up such rights. And the Attorney General's failure to apply the law equally among all nonprofits violates the Equal Protection Clause.

Plaintiffs will suffer irreparable harm if this Court does not act to enforce federal law. The Plaintiffs that operate or administer insurance plans (the "Plaintiff-Insurers") have already submitted their 2020 ACA and MA plans to federal regulators for preliminary approval, and those plans must be submitted for final approval by June 2019. *See* Declaration of John Kane

("Cain Decl.") ¶ 9–13; Declaration of John Wisniewski ("Wisniewski Decl.") ¶ 14–22.  The

Attorney General's new requirements would vitiate the assumptions that underlie the cost

structures of those plans, with potentially drastic consequences for Plaintiff-Insurers' businesses

and the broader healthcare market.  *See generally* sources cited *id*.  With the federal regulatory

processes currently ongoing, the Plaintiff-Insurers need to know whether they can stand on their

federal rights—or whether they must, instead, overhaul their insurance plans in accordance with

the Attorney General's decrees.  Insurance markets depend on clear legal rules, which are

essential to projecting costs.  Delay in providing the needed clarity here could impair the

functioning of health insurance markets throughout the State.  *See* sources cited *id*.

Given both the strong likelihood of success on the merits and the risk of irreparable harm,

the equities weigh heavily in favor of a preliminary injunction that would allow all Plaintiffs to

comply with upcoming federal deadlines free from unlawful state interference.  The Attorney

General will suffer no harm from an injunction maintaining the *status quo*.  And, the public

interest would be served.  Millions of Pennsylvanians depend on Plaintiffs' services, and an

injunction would prevent the Attorney General from upending Plaintiffs' businesses in violation

of federal law.[1]  The Court should grant this motion.

---

[1] Plaintiffs' Complaint alleges claims both in their individual capacity and as representatives of a state-wide class comprising all nonprofit healthcare entities organized under the laws of Pennsylvania.  In the interest of expediting this Court's decision, however, Plaintiffs seek preliminary relief on behalf of themselves alone.  *See Adams v. Freedom Forge Corp.*, 204 F.3d 475, 490–91 (3d Cir. 2000) (permitting preliminary injunctive relief on behalf of named plaintiffs in a putative class action).

# BACKGROUND

## I. Federal Law Governs Medicare And Self-Insured Plans.

The U.S. healthcare system is not a universal access system. Instead, it is a fragmented patchwork of publicly and privately-funded systems and programs at the federal and state level. Regulation of insurance is traditionally a state responsibility. Individual states establish standards and regulations overseeing the business of insurance, including requirements for finances, management, and business practices of state-licensed insurers. Federal law, on the other hand, governs federal public programs and the regulation of self-insured private employee health benefit plans.

This motion involves three federal statutes—the Medicare Act, the ACA, and ERISA— that preempt state law. Part C of the Medicare Act creates a program known as Medicare Advantage ("MA" or the "MA Program"), whereby private insurers and healthcare providers negotiate in-network access contracts for Medicare Advantage subscribers. Insurers—known as Medicare Advantage organizations ("MAOs")—receive a capped amount per Medicare Advantage subscriber and must compete for subscribers based on the network quality, cost, and additional benefits. Under the Medicare Act, insurers and providers cannot be forced to contract with one another. *See, e.g.*, 42 U.S.C. § 1395w-24(a)(6)(B)(iii). "The ability of health plans to construct networks that include some, but not all, providers (so called 'selective contracting') has long been seen as an important tool to enhance competition and lower costs in markets for health care goods and services," and "[b]oth economic principles and empirical evidence support that view." Federal Trade Commission, *Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Program* (Mar. 7, 2014) ("FTC

Letter").[2]  The Medicare Act expressly preempts any state law or regulation that impacts

Medicare Advantage, aside from state licensing laws or state laws relating to plan solvency.  *See*

42 U.S.C. § 1395w-26(b)(3).

The ACA also preempts state law requirements that do not place uniform regulations on

insurers.  Among other things, the ACA helped create health insurance exchanges in every state,

where individuals and small businesses can purchase private health insurance.  The ACA

mandates that all insurance plans cover the same set of minimum essential health benefits.  States

can require insurers to cover additional services that are not part of the mandated minimum

benefits.  Notably, however, the ACA intended a level playing field for *all insurers* when

designing and setting premiums for health plans to be offered on the exchanges.  To that end,

states must apply any standard or requirement *uniformly* to all ACA health plans in the market.

42 U.S.C. § 18012.  Any state action that hinders or impedes the implementation of the ACA is

preempted.  *See St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022 (8th Cir. 2015) (applying

42 U.S.C. § 18041(d)).

ERISA, meanwhile, outlines the minimum federal standards for private-sector employer-

sponsored benefits, including health insurance plans.  There is no requirement under ERISA that

health plans provide in-network access to all healthcare providers.  *See, e.g.*, *Metro. Life Ins. Co.*

*v. Massachusetts*, 471 U.S. 724, 732 (1985) (ERISA "does not regulate the substantive content of

welfare-benefit plans").  As relevant here, ERISA preempts any state laws or regulations that

relate to employee benefit plans.  *See* 29 U.S.C. § 1144(a).  ERISA is particularly important in

---

[2] *Available at* https://www.ftc.gov/system/files/documents/advocacy_documents/federal-trade-commission-staff-comment-centers-medicare-medicaid-services-regarding-proposed-rule/140310cmscomment.pdf.

the context of self-insured benefit plans.[3]  These plans are exclusively governed by federal law;

they are not subject—even indirectly—to state insurance regulations.  *See FMC Corp. v.*

*Holliday*, 498 U.S. 52, 61 (1990).

Taken together, self-insured employee benefit plans and Medicare—including the

Medicare Advantage program—pay for almost 50% of all healthcare services in Pennsylvania.[4]

And nearly 1.1 million Pennsylvania residents—indeed, 10% of all Pennsylvanians under the age

of 65—have health coverage through the ACA.[5]

## II.  The Attorney General Has Taken Over Federal Healthcare Programs.

The Pennsylvania Attorney General has asserted "vast authority" to regulate nonprofit

organizations and has used that power to impose new legal requirements that interfere with the

previously discussed federal programs and statutes.  Declaration of W. Thomas McGough, Jr.

("McGough Decl.") ¶¶ 9, 13  The Attorney General has declared that nonprofits have the

obligation to serve the *entire* public, and that any exercise of choice not to provide services is

inconsistent with nonprofit status.  *See id.* ¶¶ 9–13.  The Attorney General intends to enforce

these requirements against all nonprofits.  *See id.*; *see also* McGough Decl. Ex. D.

The Attorney General has applied his requirements first to the healthcare sector.  In a

meeting on or about November 26, 2018, and in subsequent written communications, the

---

[3] In contrast to a fully insured plan where the insurer bears the risk of providing health benefits to subscribers, self-insured organizations themselves pay for incurred health benefits typically through contracts with third-party administrators, such as UPMC Health Plan, which administer the plans.

[4] *See* Pennsylvania Insurance Department, Health Insurance, https://www.insurance.pa.gov/Coverage/Pages/Health-Insurance.aspx (last visited Feb. 9, 2019)).

[5] *See* Pennsylvania Insurance Department, Affordable Care Act in Pennsylvania Fact Sheet, at 1, https://www.insurance.pa.gov/siteassets/pages/default/aca%20fact%20sheet.pdf (last visited Feb. 9, 2019).

Attorney General set forth the rules by which all Pennsylvania nonprofit healthcare providers

and all nonprofit healthcare insurers must abide.  *See* McGough Decl. Exs. D, F.  These rules

include:

- Nonprofit health plans must contract with any healthcare provider that seeks an MA or commercial contract.  McGough Decl. Ex. F ¶ 3.3.

- Similarly, nonprofit healthcare providers must contract with any insurer that wants a commercial or MA contract.  *Id.* ¶ 3.2.

- If the parties to these forced contracts cannot agree on the rates to be paid or the other terms, they must submit to arbitration before a panel empowered to set the terms of the contract for them.  *Id.* ¶¶ 4.1 *et seq*.

- In the event that a nonprofit healthcare provider lacks a contract with a particular insurer, any emergency services provided to that insurer's subscribers must be reimbursed at rates established by the Office of Attorney General.  *Id.* ¶ 3.5.

- Nonprofits healthcare entities are barred from exercising any right to terminate a contract without cause.  *Id.* ¶ 3.6.

- Nonprofit healthcare providers are prohibited from utilizing Provider-Based Billing, defined to mean "charging a fee for the use of the … building or facility at which a patient is seen."  *Id.* ¶¶ 2.25, 3.4.

- Nonprofit healthcare providers are prohibited from including six other types of non-rate provisions in any of its contracts, including a provision that limits the dissemination of cost information.  *Id.* ¶ 3.4.

- Nonprofit healthcare providers are prohibited from engaging in any public advertising that the Attorney General determines is unclear or misleading in fact or by implication, even if the federal government has approved the advertising. *Id.* ¶ 3.10.

- Members of the Board of Directors or similar governance body of nonprofit healthcare entities can be removed and replaced at the whim of the Attorney General.  *Id.* ¶ 3.11.

The Attorney General unilaterally has imposed these rules through backroom demands

and threats, without any legislation or rulemaking.  *See generally* McGough Decl. Exs. A–G.

And these changes are extreme.  Under Pennsylvania law, it has long been the case that "[t]here

is no general common-law duty for hospitals to accept and treat all individuals" in a

nonemergency situation.  *See Torretti v. Main Line Hospitals, Inc.*, 580 F.3d 168, 173 (3d Cir. 2009); *see also Fabian v. Metzko*, 344 A.2d 569, 571 (Pa. Super. Ct. 1975) ("[A] private hospital is presently under no duty to accept non-emergency patients that it does not desire.").  Nor is there an existing law that requires contracts between insurers and healthcare providers. Legislation that would have changed this market-based access by requiring providers to give in-network contracts to insurers have never made it out of committee.  *See* HB 1621 and HB 1622 (2013).

Not long ago, the Attorney General's office itself conceded in testimony before Pennsylvania legislators that "there is no statutory basis to make" payors and providers contract with each other; that there is "no mechanism in Pennsylvania for resolving … price dispute[s]" between payors and providers; *and that this is good for competition*.  Compl. Ex. E, at 35. "[T]he contracting process involves two parties willingly coming to an agreement," and "one of the key things is that each party has the ability to walk away from the negotiations."  *Id*.  This ability "forces each side to be reasonable in most circumstances," and taking away that ability would have unpredictable effects on price.  *Id.*

Nonetheless, according to the Attorney General, if any nonprofit insurer or provider refuses to follow these new requirements, it is in violation of Pennsylvania law and subject to enforcement actions, potentially imperiling the entity's nonprofit status.  *See generally* McGough Decl. & McGough Decl. Ex. D.

## III.   Plaintiffs Need Immediate Relief From The Attorney General's New Requirements.

Plaintiffs each face direct and irreparable harm if the Attorney General's actions are not enjoined during the pendency of this litigation.  The constitutional violations inherent in the Attorney General's new requirements and the dilemma of now being subject to two conflicting legal regimes constitute irreparable harm *per se*.  *See infra* Argument § II.

8

In addition, the Attorney General's new requirements threaten imminent, deleterious, and irreparable harm to Plaintiffs UPMC Health Plan, Inc.; UPMC Health Coverage, Inc.; UPMC Health Network, Inc.; UPMC Health Options, Inc., and UPMC Benefit Management Services, Inc. (collectively, "UPMC Health Plan").  *See generally* Cain Decl.; Wisniewski Decl.  One of the most critical aspects of UPMC Health Plan's business is determining the premium rates and establishing the deductibles, co-pays, and other financial components of each plan.  *See* sources cited *id*.  To do so, UPMC Health Plan must forecast its expected costs by identifying the providers that will be in its network, knowing the reimbursement rates it has negotiated with each of those providers, and calculating the expected rate of utilization.  This complex actuarial process takes months of analysis.  *See* Cain Decl. ¶ 7–14; Wisniewski Decl. ¶ 12–22.

This process is also subject to a strict government-mandated deadlines.  UPMC Health Plan offers insurance plans in highly regulated markets, including MA plans and ACA commercial insurance plans.  These plans cannot be sold without prior government approval of the services covered, the adequacy of the provider network, and the cost to members through a mix of monthly premiums, deductibles, and co-pays.  *See* Cain Decl. ¶ 6–14; Wisniewski Decl. ¶ 14–22.  That approval process is months in the making and has imminent deadlines:  To sell MA plans for 2020, UPMC Health Plan will make its initial proposals to the federal government by February 13, 2019, and must submit its final proposals no later than June 3.  *See generally* sources cited *id*.; *see also* Cain Decl. Ex. A.  To sell ACA plans for 2020, UPMC Health Plan must submit its final proposals for regulatory approval no later than June 19.  *See* Wisniewski Decl. Ex. A.  UPMC Health Plan's forecasting and rate-setting for these markets is now being finalized based on the information known to it in order to meet those government deadlines.  *See* Wisniewski Decl. ¶¶ 27–28.

But all of this forecasting will be meaningless if, pursuant to the Attorney General's actions, unknown providers—particularly a hospital system—can force their way into UPMC Health Plan's networks after the rates and design of those plans is finalized and the government approval deadlines have passed.  Each of the key data points on which premiums were set will be obsolete.  UPMC Health Plan cannot reliably forecast costs and set premiums for the 2020 plans that must be finalized in the coming weeks when it does not know what providers will be in its network in 2020, or what the reimbursement rates for those providers will be.  *See* Cain Decl. Ex. ¶¶ 10–13; Wisniewski Decl. ¶¶ 27–28.

In the meantime, nonprofit healthcare providers face mandatory and significant reductions to their own reimbursements under the Attorney General's actions.  His new requirements prohibit charging any fee meant to cover the cost of the facility where the provider delivers healthcare services.  *See* Compl. Ex. F ¶¶ 2.24, 3.4.5; Declaration of William Pugh ("Pugh Decl.") ¶¶ 15–20; Declaration of Andrew G. Rush ("Rush Decl.") ¶¶ 10–11.  Such charges are necessary to ensure a hospital or other provider can meet basic operating expenses. *See* Rush Decl.  ¶¶ 8– 9; Pugh Decl. ¶¶ 14–16.  Like any commercial entity, nonprofit providers must be able to make more money than they spend in order to stay afloat; unlike most entities, they typically have exceedingly thin operating margins.  *See* sources cited *id*.  And yet, they will have no way to redress the sudden and significant reduction to provider reimbursements that the Attorney General's actions portend if those actions are ultimately deemed unlawful.

## ARGUMENT

"'[O]ne of the goals of the preliminary injunction analysis is to maintain the *status quo*, defined as the last, peaceable, noncontested status of the parties.'"  *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 318 (3d Cir. 2015).  The critical inquiry when granting injunctive relief is whether the moving party is likely to succeed on the merits and faces

10

the prospect of irreparable harm absent injunctive relief. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017). Where those elements are present, district courts should also "'take into account, when they are relevant, … the possibility of harm to other interested persons from the grant or denial of the injunction, and … the public interest." *Id*. (citation omitted). Each factor favors granting preliminary injunctive relief.

## I. Plaintiffs Have A Reasonable Probability Of Success On The Merits.

To establish a reasonable probability of success on the merits, the party seeking an injunction must, *inter alia*, "demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not)." *Reilly*, 858 F.3d at 179. Plaintiffs make that threshold showing in several respects.

### A. The Attorney General's Takeover Of Federal Healthcare Programs Is Preempted By The Medicare Act.

The Court should issue a preliminary injunction first because the Attorney General's new requirements for nonprofit healthcare are irreconcilable with—and preempted by—the Medicare Act. *See* Compl. ¶¶ 49–69. The Attorney General has asserted that his authority over nonprofits permits him to supersede federal law governing operation of the federally mandated (and federally funded) MA Program. *See generally* McGough Decl. This claim violates the Supremacy Clause and preemption provisions of the Medicare Act, and must be enjoined.

As noted *supra*, in creating and managing the MA Program, the federal government adopted the closed network model of healthcare that the Attorney General now seeks to demolish. Congress' intent was to "harness the power of private sector competition to stimulate experimentation and innovation that would ultimately create a more efficient and less expensive Medicare system." *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig*., 685 F.3d 353, 363 (3d Cir. 2012) (citing House Conf. Rep. No. 105-217, at 585 (1997)). Congress expressly

preempted *any* state interference with the MA marketplace, whether or not it conflicts with federal law. *See Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1149–50 (9th Cir. 2010) (MA preemption extends beyond merely "state laws and regulations *inconsistent* with the enumerated standards") (emphasis added). The preemption statute states: "The standards established under [the Medicare Act] shall supersede *any State law or regulation* (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." 42 U.S.C. § 1395w–26(b)(3) (emphasis added).[6] As the legislative history makes clear, "the MA Program is a federal program operated under Federal rules. State laws, do not, and should not apply, with the exception of state licensing laws or state laws related to plan solvency." H.R. Rep. No. 108-391, at 557 (2003) (Conf. Rep.).

The Attorney General's rules are incompatible with federal law and interfere with the MA program. The Medicare Act preempts these rules in at least the following three respects.

### 1. Federal law expressly prohibits interference with MA contracting and price structures.

The Medicare Act precludes the Attorney General from requiring either direct payor-provider contracting for MA services, or specific price structures within such contracts. The Act ensures competition in the open marketplace in part through a "noninterference" provision that applies to the MA Program and states:

> In order to promote competition under this part and part D and in carrying out such parts, the Secretary may not require any MA organization to contract with a particular hospital, physician, or other entity or individual to furnish items and services under this subchapter or require a particular price structure for payment under

---

[6] *See also* 42 C.F.R. § 422.402 ("[A]ll State standards, including those established through case law, are preempted to the extent they specifically would regulate MA plans, with exceptions of State licensing and solvency laws.").

such a contract to the extent consistent with the Secretary's authority under this part.

42 U.S.C. § 1395w-24(a)(6)(B)(iii). The agency that oversees Medicare, the Centers for

Medicare and Medicaid Services ("CMS"), has promulgated regulations to the same effect:

> (i) In carrying out Parts C and D under this title, CMS may not require any MA organization to contract with a particular hospital, physician, or other entity or individual to furnish items and services.

> (ii) CMS may not require a particular price structure for payment under such a contract, with the exception of payments to Federally qualified health centers as set forth at § 422.316.

42 C.F.R. § 422.256(a)(2).

These noninterference provisions guarantee the freedom of each MAO and healthcare provider to negotiate their own price structures or decide not to contract at all; forcing either a provider or an insurer into an involuntary contract would replace market-based pricing with a "particular price structure" of the government's own devising, in violation of both statute and regulation. Courts thus hold state laws and regulations are preempted where they regulate some aspect of MA administration. Among other things, courts have applied the clause to preempt private suits enforcing generally-applicable state consumer protection laws, *see Do Sung Uhm*, 620 F.3d at 1152, 1157; regulatory actions by state officials seeking to expand the benefits available under MA plans, *see Massachusetts Ass'n of HMOs v. Ruthardt*, 194 F.3d 176, 177 (1st Cir. 1999); and state regulation of a MAO's operation of its provider network, *Morrison v. Health Plan of Nev., Inc.*, 328 P.3d 1165, 1170 (Nev. 2014); *see also Pacificare of Nev., Inc. v. Rogers*, 266 P.3d 596, 600 (Nev. 2011) (Medicare Act preempts actions based on state contract and tort law concerning an MA organization's operation of its provider network); *Meek-Horton v. Trover Sols., Inc.*, 915 F. Supp. 2d 486, 492 (S.D.N.Y. 2013) (same).

13

The Attorney General would supplant this federal regime with new rules of his own. *First*, he is imposing a "duty to negotiate" on both insurers and providers and is forcing them to submit to "last best offer arbitration after 90 days to determine all unresolved material contract terms." *See* Compl. Ex. A ¶¶ 3.3, 4.3.  Under federal law, the terms of any contract between providers and insurers are to be set by the market, not government fiat, and for that to occur both providers and MAOs must be free not to contract at all.  Indeed, the Medicare Act expressly states that regulators "may not require any MA organization to contract."  42 U.S.C. § 1395w-24(a)(6)(B)(iii).  By compulsion of the Attorney General, however, Plaintiffs *must* contract with any MAO or provider interested in contracting with them.  They are similarly forced to accept whatever price structure is imposed on them though a binding arbitration process to which they did not consent.  That is inconsistent with the system that Congress codified for the MA Program.

*Second*, the Attorney General is further mandating a specific price structure by prohibiting nonprofit providers from exercising "provider-based billing."  *See* Compl. Ex. A ¶ 3.4.5.  Provider-based billing, also known as "facility-based billing," or "hospital outpatient billing," allows a hospital to charge for services rendered at an outpatient facility of the hospital and to charge a fee for use of the facility.  *See generally* Pugh Decl. ¶ 15; Rush Decl. ¶ 10.  Pursuant to the Medicare Act, CMS recognizes certain outpatient facilities of hospitals, including remote facilities from the hospital's main campus, and allows such facilities to bill and be paid by Medicare at the hospital's rates.  *See* sources cited *id.*; 42 C.F.R. § 413.65.  Provider-based billing is also allowed under contracts that hospitals enter into with insurers and other third party payors.  Here, the Attorney General has now eliminated this practice from the nonprofit MA program in Pennsylvania— including Plaintiff-Insurers' MA plans—contrary to both the

noninterference provisions and Section 413.65 itself.  He is preempted from doing so under 42

U.S.C. § 1395w-26(b)(3).

2.      **The Attorney General cannot displace out-of-network rates set by Congress.**

Congress specifically regulates out-of-network rates for MA services.  Hospitals are

required to provide emergency services to MA patients regardless of whether there is an in-

network contract with the patient's insurer.  Where a hospital has chosen not to contract with an

insurer but has provided emergency MA services to that insurer's members, federal law provides

that the hospital may only recover the amount it would be entitled to under traditional Medicare.

*See* 42 U.S.C. § 1395w-22(k)(1); 42 C.F.R. § 422.214.

Here too, the Attorney General is imposing his own rules.  According to his new

requirements for Pennsylvania nonprofit healthcare providers, hospitals must charge the

"average in-network rates for any patient receiving emergency services on an out-of-network

basis," even if that rate differs from what Congress set by statute for out-of-network MA

emergency services.  Compl. Ex. A ¶ 3.5.  This is invalid.  Preemption protects the federal

scheme and compels enjoining the Attorney General's alternative standards.

3.      **The Attorney General seeks to take from CMS regulation of MA advertising.**

CMS has exclusive authority to regulate the marketing materials of MAOs, and no such

materials may be circulated without prior review by the Secretary of Health and Human

Services.  *See* 42 U.S.C. 1395w-21(h)(2).  Its authority is comprehensive, and extends to mailers,

advertisements, web sites, and all other forms of contact meant to persuade someone to enroll in

an MAO's plan.  *See* 73 Fed. Reg. 28556-01, at 28581 (May 16, 2008).  Because "CMS has a set

of standards it uses in evaluating marketing materials," any state authority that purports to alter

or supplement those standards "is superseded by federal law."  *Clay v. Permanente Med. Grp.,*

*Inc.*, 540 F. Supp. 2d 1101, 1109 (N.D. Cal. 2007) (Medicare Act preempts actions challenging marketing materials for federally approved Medicare products); *see also Phillips v. Kaiser Found. Health Plan, Inc.*, 953 F. Supp. 2d 1078, 1087, 1090 (N.D. Cal. 2011) (same).

The Attorney General now purports to take from CMS final oversight of advertising and marketing related to MA insurance plans.  *See* Compl. Ex. A ¶ 3.10 (prohibiting nonprofits from engaging in any "public advertising that is unclear or misleading in fact or by implication").  His new (entirely unknown) marketing standards cannot co-exist with CMS standards.  Pursuant to 1395w–26(b)(3), the Attorney General's new requirements are preempted.

### B.  The ACA Preempts General Shapiro From Discriminating Against Nonprofit Health Plans.

The ACA prompted the largest and most comprehensive federal overhaul of the United States healthcare industry since the inception of Medicare and Medicaid.  Among other things, the ACA created insurance exchanges in every state, where individuals and small businesses can purchase affordable health insurance.[7]  The Act intended to "increase the number of Americans covered by health insurance and decrease the cost of health care."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).

The ACA has proven remarkably successful in helping Pennsylvanians obtain insurance. The state uninsured rate fell from 10.2% in 2010 to 6.4% in 2015, the lowest uninsured rate ever recorded.  *See* Pennsylvania Insurance Department, *Affordable Care Act in Pennsylvania Fact*

---

[7] The ACA provides a mechanism for states to establish their own exchanges.  42 U.S.C. §18031(b).  If a state chooses not to establish its own exchange, the Secretary of Health and Human Services (HHS) is responsible for establishing and operating the exchange.  *See, e.g.*, 42 U.S.C. §18041(c)(1); Fed. Reg. 42824.  The federal exchange is often referred to as a federally facilitated exchange (FFE).  42 U.S.C. §18041(c)(1).  Pennsylvania opted not to create an exchange, so HHS created and operates the FFE in Pennsylvania.  The Pennsylvania exchange is available through www.healthcare.gov.

*Sheet*, at 1.[8]  Over 10% of Pennsylvania residents under age 65 have health insurance purchased

through the ACA exchange.  *See id.*  Plaintiff UPMC Health plan offers the lowest priced plans

in Western Pennsylvania and services about 70% of the ACA exchange market.  *See* Louise

Norris, Healthinsurance.org, *Pennsylvania health insurance marketplace: history and news of

the State's exchange* (Dec. 16, 2018).[9]

Among other things, the ACA sets minimum standards for health insurance, ensuring

consistency among the products in the market and giving consumers confidence that all products

at the same metal level (i.e, bronze, silver, gold, or platinum) offer comparable benefits.  *See,

e.g.*, H.R. Rep. No. 111-443, Pt.1, at 214 (2010) (stating that each product must offer "minimum

standard benefits … ensure that all plans meet the basic needs and enable people to compare

policies in the Exchange on the basis of cost and quality – not hidden differences in benefits").

To that end, health plans offered under the ACA must meet a detailed set of requirements—

covering topics such as benefits, network adequacy, and rating (i.e., premiums)—before they can

be offered on the exchange.  *See* 42 U.S.C. §18031(c)(1) (establishing the certification process

for products offered on the exchange).

The ACA also contains an express preemption clause to ensure that these minimum

federal standards are applied consistently from state to state.  Any state standards that "prevent

the application of the provisions" of the ACA are preempted.  42 U.S.C. § 18041(d)); *St. Louis

Effort for AIDS v. Huff*, 782 F.3d 1016, 1022 (8th Cir. 2015) (stating that state regulatory actions

"that hinder or impede the implementation of the ACA run afoul of the Supremacy Clause").

---

[8] *Available at*
https://www.insurance.pa.gov/siteassets/pages/default/aca%20fact%20sheet.pdf (last visited Feb. 20, 2019).

[9] *Available at* https://www.healthinsurance.org/pennsylvania-state-health-insurance-exchange/.

The ACA further provides that state standards and requirements must apply *uniformly* to all health insurance carriers in each insurance market to which the requirements apply. 42 U.S.C. § 18012. This provision aims to provide stability in each state's insurance markets. Along these lines, CMS has cautioned that "imposing different benefit mandates depending on a plan's status" would violate the ACA because the state would be imposing standards that are not applied uniformly within the applicable insurance market. *See* Fed. Reg. 12204 (Mar. 8, 2016), at 12243. Accordingly, federal law preempts any state requirements on ACA products that impose different standards on nonprofit health plans as compared to for-profit plans.

Here, the Attorney General is imposing requirements on nonprofits within the applicable insurance market that would not apply to for-profit insurers. Nonprofit health insurers that market ACA plans, including the UPMC Health Plan, are now subject to General Shapiro's new requirements and must incur the cost and harm associated with compulsory-provider-contracting and transfer of ultimate control over rates from the plan and its actuaries to a private arbitration panel. *See generally* Wisniewski Decl. For-profit competitors offering substantially similar plans, however, are exempt from the Attorney General's new rules and are free to choose the providers in their networks and pay rates that are voluntarily negotiated between the parties. The Attorney General's requirements violate 42 U.S.C. § 18012 and are thus preempted under 42 U.S.C. §18041(d). *See also Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992) ("A state law ... is preempted if it interferes with the methods by which the federal statute was designed to reach [its] goal.") (internal quotation marks omitted).

### C. The Attorney General's Takeover Of The Nonprofit Healthcare Sector Is Preempted By ERISA.

Plaintiffs also are likely to prevail because ERISA preempts aspects of the Attorney General's nonprofit takeover. As noted *supra*, employers that offer ERISA-regulated self-

insured plans often contract with insurers to act as third-party administrators that can contract with providers, process individual healthcare claims, and provide similar administrative services related to operation of a benefit plan. *See* Wisniewski Decl. ¶ 6. UPMC Benefit Management Services, Inc. acts as a third-party administrator for self-insured plans subject to ERISA.[10] *Id.*

ERISA contains a broad preemption provision. Federal law "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The phrase "relate to" is given "its broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan in the normal sense of the phrase, if it has a *connection with* or *reference to* such a plan," *Metro. Life Ins.*, 471 U.S. at 739 (emphasis added) (marks and citation omitted). A state law that "mandate[s] employee benefit structures or their administration" relates to employee benefit plans for purposes of ERISA preemption. *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 658 (1995).

Section 1144's reference to "State laws" is broadly defined. It encompasses "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1). This sweeping language establishes the regulation of employee benefit plans "as exclusively a federal concern." *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 523 (1981). The provision is intended to "minimize the administrative and financial burden of complying with conflicting directives," and to "prevent the potential for conflict in substantive law … requiring the tailoring of plans and employer conduct to the peculiarities of the law of each jurisdiction." *Travelers*, 514 U.S. at 656–57 (marks and citation omitted).

---

[10] UPMC Benefit Management Services, Inc. is a for-profit subsidiary within the nonprofit UPMC system. General Shapiro has made clear his demands encompass all subsidiaries of any nonprofit health system, including for-profit subsidiaries.

Courts have applied this preemption provision to "all willing provider" laws. Such laws require health plans to contract with any provider that meets specific terms and conditions for participation in the plan's network. *See generally* Larry J. Pittman, *"Any Willing Provider" Laws and ERISA's Saving Clause: A New Solution for an Old Problem*, 64 Tenn. L. Rev. 409, 427–28 (1997) (collecting sources). All willing provider laws forbid ERISA plans from offering "restricted provider networks," and for that reason courts find that the laws "relate to" employee benefit plans and "mandate[] the benefit structure of" these plans. *Cmty. Health Partners, Inc. v. Com. of Ky.*, 14 F. Supp. 2d 991, 999–1000 (W.D. Ky. 1998). Accordingly, these "all willing provider" laws are presumptively invalid under the preemption provision of Section 1144. *See, e.g.*, *id.* at 993; *see also Ky. Ass'n of Health Plans, Inc. v. Nichols*, 227 F.3d 352, 363 (6th Cir. 2000), *aff'd sub nom. Ky. Ass'n of Health Plans, Inc. v. Miller*, 538 U.S. 329 (2003); *CIGNA Healthplan of La., Inc. v. State of La. ex rel. Ieyoub*, 82 F.3d 642, 648 (5th Cir. 1996).[11]

The Attorney General's requirements for nonprofits are more extreme than these all willing provider laws. By design, the Attorney General's requirements "relate to" self-insured benefit plans in at least the following ways. *First*, the Attorney General demands not just that insurers like UPMC Benefit Management Services, Inc. open their networks to all providers, but also that all nonprofit providers contract with all willing insurers. Mandating benefit structure by

---

[11] All willing provider laws are not new, and they have long been heavily criticized as inconsistent with the dominant paradigm for healthcare in this country. As noted *supra*, U.S. healthcare works in part by allowing restricted networks, which incentivize providers to agree to significant price discounts in exchange for the anticipated volume. By preventing an insurer from guaranteeing providers nearly exclusive access to its members, all willing provider laws remove that incentive. *See* Pittman, 64 Tenn. L. Rev. at 429; *see also* Managed Care: State Regulation Can Control Perverse Capitation Incentives, Health Care Daily (BNA) (Feb. 15, 1996); Bruce W. Karrh, *Health Care Reform in the United States*, 13 Del. Law. 17, 20 (1995); David L. Meyer & Charles F. Rule, *Health Care Collaboration Does Not Require Substantive Antitrust Reform*, 29 Wake Forest L. Rev. 169, 179–81 (1994). Notably, "all willing" laws have been proposed in Pennsylvania and have been repeatedly rejected by the Legislature.

precluding restricted networks "relates to" employee benefit plans. *See Kentucky Ass'n of Health Plans*, 227 F.3d at 366 (holding that an all willing provider law "could not be enforced … against the employer who has a self-insured ERISA plan nor against the administrator of such a plan").

*Second*, as noted, if the parties cannot agree on terms, the Attorney General would empower either side to force a contract through mandatory arbitration, with a panel resolving any disputed contract term, including price. Regulating the *amount of benefits* provided under a plan, including by setting rates through binding arbitration, also triggers ERISA's preemption statute. *See Aetna Life Ins. Co. v. Borges*, 869 F.2d 142, 146–47 (2d Cir. 1989) ("What triggers ERISA preemption is not just any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit.").

*Third*, the Attorney General is mandating certain substantive terms of the provider-payor relationship, such as the prohibition on both provider-based billing and contract termination without cause. Under ERISA, such terms are choices that ultimately rest with plan administrators, not state officials. *See, e.g., FMC Corp. v. Holliday*, 498 U.S. 52, 60 (1990) (state anti-subrogation statute preempted because it restricted structure of ERISA plans).

*Fourth*, the Attorney General's requirements "relate to" ERISA plans because of the "acute, albeit indirect, economic effects" that will inevitably threaten the plan's ability to provide certain "substantive coverage" or to "effectively restrict its choice of insurers." *Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 943 (2016); *see also Keystone Chapter, Associated Builders & Contractors, Inc. v. Foley*, 37 F.3d 945, 963 (3d Cir. 1994). The Attorney General's requirements will impose significant added costs on plan administrators, raising the costs that

21

those administrators pass on to ERISA plans. These plans, in turn, would be compelled to reduce the substantive benefits available to their employees or shift their business away to for-profit administrators not subject to the Attorney General's decree.

No state or government agency has ever proposed such a radical transformation to self-insured healthcare, and ERISA preempts the Attorney General from doing so here. Permitting the Attorney General's new requirements to stand would create the kind of significant and detrimental economic impact that ERISA preemption is intended to prevent. UPMC Benefit Management Services, Inc., for instance, provides third-party administrative services for plans with members in different states. Wisniewski Decl. ¶ 6. ERISA plans subject to the Attorney General's new requirements would face drastically different requirements when doing business in Pennsylvania than in other states. Such employee benefit plans would face the "conflicting directives" from different Pennsylvania requirements that necessitate the kind of "administrative and financial burden" that Congress sought to avoid by making regulation of these plans an exclusively federal issue. *Travelers*, 514 U.S. at 656–57; *see also Alessi*, 451 U.S. at 523; *Rosario–Cordero v. Crowley Towing & Transp. Co.*, 46 F.3d 120, 123 (1st Cir. 1995) ("By preventing states from imposing divergent obligations, ERISA allows each employer to create its own uniform plan, complying with only one set of rules (those of ERISA) and capable of applying uniformly in all jurisdictions where the employer might operate."). Intervention by this Court is needed to safeguard Congress' mandate.

**D.** **The Attorney General's Mandates Constitute Unreasonable Restraints of Trade In Violation Of Section 1 Of The Sherman Act.**

Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared illegal." 15 U.S.C. § 1. A "governmentally imposed trade

restraint"—what the Attorney General seeks here—"that enforces private pricing decisions is a 'hybrid restraint' that fulfills the Sherman Act's 'concerted action requirement." *TFWS, Inc. v. Schafer*, 242 F.3d 198, 208 (4th Cir. 2001). In such "hybrid-restraint" cases, "the Supreme Court has made clear that an actual 'contract, combination or conspiracy' need not be shown for a state statute to be preempted by the Sherman Act." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 223 n.17 (2d Cir. 2004) (citing *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 345–46 n.8 (1987)).

While the Attorney General's mandates here fall far short of a state statute, his regime of forced contracts at rates set by self-interested market participants nonetheless enforces private pricing decisions.[12] His mandates are therefore subject to the two-pronged *Midcal* inquiry established in *Cal. Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 104 (1980), to determine whether they qualify for state-action immunity. *See also A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 259 (3d Cir. 2001) ("[Hybrid restraints involve a degree of private action which calls for a *Midcal* analysis.").

### 1. The Attorney General's dictates are not protected by state-action immunity.

"[G]iven the antitrust laws' values of free enterprise and economic competition, 'state-action immunity is disfavored, . . . and is recognized only when it is clear that the challenged anticompetitive conduct is undertaken pursuant to the 'State's own' regulatory scheme." *Phoebe Putney Health*, 568 U.S. at 1005 (quoting *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 635–36 (1992)). "To qualify as state action under the *Midcal* test, 'the challenged restraint must be one

---

[12] Unlike a state statute, the Attorney General's unilateral and unauthorized demands should be afforded no deference under the comity principles underlying the state-action immunity doctrine. *See F.T.C. v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 227–28 (2013) (state hospital authority not entitled to state-action immunity from federal antitrust laws); *City of Lafayette, La. v. Louisiana Power & Light Co.*, 435 U.S. 389, 413–14 (1978) (municipal activity not accorded same deference as official state actions).

'clearly articulated and affirmatively expressed as state policy.'" *Id.* (quoting *Midcal*, 445 U.S. at 104. "The second prong of the *Midcal* test is whether the resulting antitrust violation was actively supervised by the state." *A.D. Bedell*, 263 F.3d at 260.

Neither prong is met here. There is no "clearly articulated" and "affirmatively expressed" state policy supporting the Attorney General's mandates. In fact, his regime has been affirmatively *rejected* by the Pennsylvania General Assembly. *See* HB 1621 and HB 1622 (2013); HB 345 (2017).[13] And the Attorney General has previously admitted that there is no statutory basis for forcing contracts between nonprofit health plans and healthcare providers.

Nor are the rates that would emerge from the Attorney General's arbitration scheme "actively supervised" by the state. A mere "arrangement sponsored by the state" does not qualify as state action. *A.D. Bedell*, 263 F.3d at 263 (quoting *Norman's on the Waterfront, Inc. v. Wheatley*, 444 F.2d 1011, 1017 (3d Cir. 1971)). Active supervision "requires that state officials have and exercise power to review particular anticompetitive acts of private parties and disapprove those that fail to accord with state policy." *A.D. Bedell*, 263 F.3d at 260 (internal quotation and citation omitted). In cases involving prices, "active supervision" requires that the state actually review and approve of the pricing. *See Midcal*, 445 U.S. at 105–06 (California regulation on wine pricing did not satisfy the active supervision prong because the "State neither establishes prices nor reviews the reasonableness of the prices schedules"); *Norman's on the Waterfront*, 444 F.2d at 1017 (because the Virgin Islands Alcoholic Beverages Fair Trade Law

---

[13] As noted in a January 5, 2017 legislative memorandum accompanying HB 345, "Pennsylvania currently does not have 'Any Willing Provider' (AWP) legislation despite multiple attempts." *See* Anthony M. DeLuca, *Memorandum on "Any Willing Provider Legislation"* (Jan 5, 2017), *available at* https://www.legis.state.pa.us/cfdocs/Legis/CSM/showMemoPublic.cfm?chamber=H&SPick=20 170&cosponId=21773.

did not grant the power to "approve, disapprove, or modify the prices fixed by private persons," program did not meet active supervision prong).

Here, the Attorney General has not himself established in-network rates, but merely an "arrangement" through which private, self-interested parties will establish those rates. If the parties cannot agree to the terms of a contract, a five-member arbitration panel will do so through arbitration. *See* Compl. Ex. A ¶ 4.3.1. Of the five members of the arbitration panel, one will be appointed by the insurer making the proposal; one will be appointed by the Pennsylvania Health Access Network, an organization with the express goal of "making our health care system more affordable and accessible for all Pennsylvanians"; and two will be appointed by members of the Chamber of Commerce, which comprises companies frequently responsible for paying the cost of healthcare. *See id.* The proposed regime does not provide for any state agency to actively review, approve, or disapprove of the rates established by the arbitration panel.

"Absent such a program of supervision, there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *Patrick v. Burget*, 486 U.S. 94, 100–01 (1988). The regime does not pass muster under the second prong of the *Midcal* test. Indeed, the Attorney General has previously conceded that his arbitration process would not qualify for state-action immunity. *See* Compl. Ex. B, at 4.

### 2. The Attorney General's dictates are anti-competitive.

On its face, the Attorney General's demand for forced contracting violates "the long recognized right of [a] trader or manufacturer . . . freely to exercise his own independent discretion as to the parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *King Drug Co. of Florence v. Smithkline Beecham Corp.*, 791 F.3d 388,

25

409 n.32 (3d Cir. 2015); *Intervest Fin. Servs., Inc. v. S.G. Cowen Sec. Corp.*, 206 F. Supp. 2d

702, 712 (E.D. Pa. 2002), *aff'd sub nom. InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144 (3d

Cir. 2003) ("The Supreme Court has consistently adhered to the view that a private

businessperson or entity may refuse to deal with another company."); *see also Fabian v. Metzko*,

344 A.2d 569, 571 (Pa. Super. Ct. 1975) ("[A] private hospital is presently under no duty to

accept non-emergency patients that it does not desire.").

The Supreme Court's *Colgate* principle is consistent with the core tenet of competition

policy that one should be free to choose with whom he deals and on what terms.[14] The Attorney

General's office has repeatedly recognized that this principle applies with full force to

negotiations between nonprofit providers and health plans. For example, in opposing the merger

of the Penn State Hershey Medical Center ("Hershey") and PinnacleHealth System (now

Plaintiff UPMC Pinnacle) in 2016, the Attorney General's office stated:

> Competition between hospitals leads to both lower prices (as
> described immediately below) and to improvements in quality of
> care and service to patients. . . . Prices are negotiated between each
> hospital and health insurance company. Like any business deal,
> both sides have some amount of bargaining power, or "leverage,"
> and the agreement reached depends on the relative strengths of that
> leverage. ***Leverage ultimately is a function of a party's ability to
> walk away from the negotiation and refuse to do business with its
> negotiating partner***. Thus, in bargaining over hospital prices, if the
> hospital demands too high a price and the insurer abandons the
> negotiation, the hospital will lose access to most of that insurer's
> members. . . . Conversely, if the insurer insists on an unacceptably
> low price and the hospital walks away, the insurer will be unable to
> include the hospital in its network and must offer a policy that does
> not cover the hospital. A hospital's leverage thus depends on how
> important it is to the insurer's network, which reflects both patient
> preferences for the hospital and the availability of desirable
> alternative substitute hospitals.

---

[14] This is true even when a supplier also competes with an entity at the next level of
distribution. *See Pacific Bell Telephone Co. v. Linkline Communications, Inc.*, 555 U.S. 438
(2009).

Compl. Ex. D, at 6–7 (emphasis added).[15]

Separately, the Attorney General's office testified before the Pennsylvania House of Representatives that the *inability* to force contracts "is good for competition, and that "putting our finger on the scale in favor of one side or the other changes that dynamic in ways that are unpredictable." Compl. Ex. E, at 35. Likewise, both the Department of Justice and the Federal Trade Commission, the two federal agencies principally responsible for enforcing the Sherman Act, have long expressed concerns over the anti-competitive effects of forced contracting between health plans and healthcare providers.[16]

Aspects of the Attorney General's regime further exacerbate the anti-competitive nature of his mandates. Most obviously, the insurer-rigged, "finger on the scale" arbitration scheme will inevitably result in the selection of lower reimbursement rates to providers. The Attorney General's rules are not unlike comprising an arbitration panel of four elementary school students

---

[15] Given the Attorney General's successful challenge to the Hershey-Pinnacle merger, it is estopped from now arguing that forced contracts between nonprofit health plans and providers is somehow good for competition. *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001).

[16] *See* Department of Justice & Federal Trade Commission, *Improving Health Care: A Dose of Competition*, Chapter 6 at 30 (July 2004), *available at* https://www.ftc.gov/sites/default/files/documents/reports/improving-health-care-dose-competition-report-federal-trade-commission-and-department-justice/040723healthcarerpt.pdf (citations omitted); *see also* Department of Health and Human Services, *Reforming America's Health System Through Choice and Competition*, at 63–67 (Dec. 2018), *available at* https://www.hhs.gov/sites/default/files/Reforming-Americas-Healthcare-System-Through-Choice-and-Competition.pdf.

While the Attorney General's rules purportedly would not require a nonprofit health plan to include a provider in a "particular Narrow Network Plan" (Compl. Ex. A. ¶ 3.3), this does not eliminate the anti-competitive effect of his mandates. Requiring that nonprofit health plan accept all providers, regardless of their need, alignment with the health plan's business model, and ability to reach agreement on rates, will increase the health plan's administrative costs and impair its ability to leverage price concessions from providers. The health plan's narrow network providers will be less willing to discount their rates given the potential loss of volume to new providers, particularly since the new provider would likely be able to secure comparable rates under the arbitration structure.

and one teacher to determine the amount of nightly homework. The Third Circuit has squarely held that schemes that could lead to "artificially depressed" reimbursement rates to healthcare provides are anti-competitive. *See West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 104 (3d Cir. 2010) ("Even if it were true that paying West Penn depressed rates enabled Highmark to offer lower premiums, it is far from clear that this would have benefitted consumers, because the premium reductions would have been achieved only by taking action that tends to diminish the quality and availability of hospital services").

The same is true here. UPMC and other nonprofit healthcare providers in Pennsylvania will be forced to accept insurer-dominated rates that may not be sufficient to cover operational costs and provide sufficient margin to assure quality and access to care, healthcare innovation, and continuation of the nonprofit's charitable missions. *See* McGough Decl. ¶¶ 15–20; Pugh Decl. ¶¶ 12–21; Rush Decl. ¶¶ 7–15. Nonprofit providers directly impacted by price increases across many different markets (*e.g.*, labor, supply, and equipment costs) must be able to control the minimum price at which they will provide services. Providers like UPMC must constantly forecast their expected utilization, revenue, and costs and evaluate whether their negotiated reimbursement rates will provide funding sufficient to support their operations. *See* sources cited *id*. The Attorney General's regime would decimate the ability of nonprofit providers to assure sufficient funding for their operations and charitable missions, forcing many providers to shutter their doors. *See* sources cited *id*.

At the very least, the Attorney General's regime would tend to stabilize prices and insulate them from the flexibility of the free market. In determining rates, the arbitration panel is

required to consider a number of delineated factors plainly designed to stabilize prices.[17]

Moreover, the public dissemination of reimbursement rates decided by the arbitration panel,

coupled with the Attorney General's prohibition on contractual provisions which protect the

confidentiality of commercially sensitive cost information, will predictably lead to price

standardization across the industry.[18]  Providers will be forced to accept standardized rates in

lieu of incurring the expense, delay, and dim prospects of a biased arbitration, and will be

disinclined to compete on terms other than price.  Just the insurer's ability to force a provider

into this arbitration process distorts the bargaining process in anti-competitive ways.

In *Anheuser-Busch, Inc. vs. Goodman*, 745 F. Supp. 1048 (M.D. Pa. 1990), this District

struck down a "hybrid restraint" which shares "price stabilization" effects similar to the Attorney

General's regime here.  There, the plaintiff challenged Pennsylvania Liquor Control Board

regulations that prohibited manufacturers from increasing beer prices within a 180-day period

after any price reduction, required manufacturers to provide the same discounts to all distributors

in the state, and mandated that any price reductions be reflected "throughout the chain of

distribution."  *Id.* at 1055–56.  While the regulations did not themselves represent a conspiracy

amongst competitors to fix prices, the court nonetheless held that the regulations were a *per se*

---

[17] *See* Compl. Ex. A ¶¶ 4.3.4.1–4.12.  The panel must consider, among other factors, the terms of the existing contracts between the parties; prices paid for comparable services by other health plans and/or accepted by other providers; the weighted average rates of other area hospitals of similar size and clinical complexity for all payors, by product line; the rate of inflation; and the actual impact of the proposed contract or rates paid by the health plan in comparison to the rates paid throughout Pennsylvania and the United States.

[18] *See Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 896 (9th Cir. 2008) (quoting John E. Lopatka & William H. Page, *State Action and the Meaning of Agreement Under the Sherman Act: An Approach to Hybrid Restraints*, 20 Yale J. On Reg. 269, 311 (2003) ("Under conventional models of oligopoly behavior, the dissemination of information about prices and a credible commitment to maintain those prices reduce a firm's uncertainty about its rivals pricing behavior and thereby predictably foster a non-competitive outcome.").

violation because they "facilitate anti-competitive" and "price-maintenance" schemes amongst horizontal competitors.  *Id.* at 1055–57.  The Court concluded:  "Any regulation tending to stabilize prices, insulate prices from the flexibility of the free market, or impede a manufacturer's ability to employ market strategies through short-term or geographically-based price promotions is counter to the broad thrust of the Sherman Act."  *Id*. at 1056.  That is precisely the forecasted effect of the Attorney General's regime.

At bottom, the Attorney General's regime would enable price fixing by unsupervised market participants and skew free bargaining and ordinary negotiation dynamics.  This regime undeniably "tampers with price structures" with the effect of "depressing, fixing, pegging, or stabilizing the price" of provider reimbursement rates and, accordingly, is illegal *per se*.  *Ohio v. Am. Express Co.*, 310 U.S. 150, 221–23 (1940); *Anheuser-Busch, Inc. vs. Goodman*, 745 F. Supp. at 1056–57.

When plaintiffs have made a strong or even reasonable showing that challenged conduct constitutes an unreasonable restraint of trade—including the actions of governmental entities— federal courts have not hesitated to issue preliminary injunctions to protect plaintiffs' rights, prevent irreparable harm, and promote the public interest.[19]  *See, e.g.*, *Teladoc, Inc. v. Texas Med. Bd.*, 112 F. Supp. 3d 529, 536–41 (W.D. Tex. 2015) (enjoining enforcement of Texas Medical Board code provision requiring face-to-face examination of patients prior to prescribing controlled substances, finding that plaintiff had made "a prima facie showing they are likely to succeed on the merits of their claim under the Sherman Act"); *Cmty. Commc'ns Co. v. City of Boulder, Colo.*, 485 F. Supp. 1035, 1040 (D. Colo.), *rev'd*, 630 F.2d 704 (10th Cir. 1980), *rev'd*,

---

[19] Plaintiffs will be prepared, if necessary, to present expert testimony at any preliminary hearing or trial on the merits of the Sherman Act claim to further describe the anti-competitive nature of the Attorney General's new requirements.

455 U.S. 40 (1982) (enjoining enforcement of emergency ordinance that would restrict cable operator from expanding its business, based on "reasonable probability" the city's actions "will be declared unlawful under the antitrust laws"); *Knudsen Corp. v. Nevada State Dairy Comm'n*, 676 F.2d 374, 378–79 (9th Cir. 1982) (affirming grant of preliminary injunction against enforcement of Nevada regulation that required public disclosure and adherence to prices for dairy products, finding plaintiff had shown a "strong possibility of its success on the merits").

E. **The Attorney General's Takeover Of Pennsylvania Nonprofits Violates The United States Constitution.**

Plaintiffs also are likely to prevail on their claim that the Attorney General's takeover of the nonprofit sector violates the United States Constitution. Simply by force of will—without following any lawful procedure—the Attorney General has imposed a radical vision under which nonprofits must provide their services to all who ask, even when doing so is inconsistent with their understanding of how best to promote their mission. This unprecedented appropriation of the nonprofit sector violates a number of the Constitution's guarantees.

1. **The Attorney General's rule by fiat does not provide any procedure consistent with due process.**

*First*, the Attorney General's assertion of boundless authority to rule the nonprofit sphere through *ad hoc* decree cannot be reconciled with due process. The Fourteenth Amendment provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. 14 § 1. These words "signify about all there is of the principle that ours is a government of laws, not of men, and that we submit ourselves to rulers only if under rules." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 646 (1952) (Jackson, J., concurring). Due process is therefore violated when rights and liberties are determined "on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also*

31

*Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (government must operate under a "framework of ordered liberty" rather than "complete discretion"). Yet that is exactly what the Attorney General has done here, as he has imposed his will on the nonprofit sector through simple fiat, with no procedure at all.

A.     To establish a procedural due process violation, a plaintiff must show that "(1) they were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty or property; and (2) the procedures available did not provide due process of law." *Dennis v. DeJong*, 867 F. Supp. 2d 588, 623 (E.D. Pa. 2011). Here, the Attorney General's new requirements undoubtedly deprive Plaintiffs of protected liberty and property rights, and the Attorney General formulated and announced those requirements in an *ad hoc* manner that did not follow *any procedure* at all.

As for the first step of the analysis, Plaintiffs have protected property and liberty interests that are implicated in this case. The Attorney General's requirement that Plaintiffs and other nonprofits enter into involuntary contracts violates Plaintiffs' right *not* to contract, a necessary corollary of the right to contract. *See Baraka v. McGreevey*, 481 F.3d 187, 209 (3d Cir. 2007) (recognizing that "[t]he liberty interests protected by procedural due process [include] the right of the individual to contract" (marks and citation omitted)).[20] Moreover, in requiring these compulsory contracts, the Attorney General has assumed the power to set rates for medical services—as, after all, reimbursement rates are the primary subject of such agreements—and compulsory rate-making has long been understood to implicate protected property interests. *See, e.g.*, *N. California Power Agency v. Morton*, 396 F. Supp. 1187, 1193 (D.D.C. 1975). Courts

---

[20] *Cf. Garris v. Hanover Ins. Co.*, 630 F.2d 1001, 1006 (4th Cir. 1980) (holding that restriction on right to terminate contracts violates the Contracts Clause); *Ross v. City of Berkeley*, 655 F. Supp. 820, 835–36 (N.D. Cal. 1987) (same).

thus hold that "rates … may not be fixed by fiat," and instead "[a] meaningful rate-making

procedure … must be evolved." *Id.*

      As for the second step of the analysis—the adequacy of the procedures adopted—the

Attorney General has formulated these new rules for the entire nonprofit sector without

following *any* kind of formal procedure. Rather than proceeding through legislation, regulation,

or any other form of legal process, the Attorney General simply announced his rule as binding

law. *See* McGough Decl. Exs. A–G. This lack of *pre*-deprivation process, moreover, frustrates

*post*-deprivation review, as it removes the Attorney General's actions from the scope of the

State's administrative review act. *See Phila. Cty. Med. Soc. v. Kaiser*, 699 A.2d 800, 806 (Pa.

Commw. Ct. 1997) ("If [an] agency action is not an 'adjudication,' then it is not subject to

judicial review by way of appeal."). The resulting lack of procedural safeguards—either before

or after the deprivation—is at odds with any notion of due process. *See, e.g.*, *Isbell v. Bellino*,

962 F. Supp. 2d 738, 751 (M.D. Pa. 2013) (finding due process violation where "there was

utterly no process"). Rule by the Attorney General's *ad hoc* discretion is not the rule of law at

all.

      This case is even more extreme than *North California Power*, where the Court found that

an agency's *ad hoc* approach to ratemaking violated procedural due process. In that case, a

federal agency charged with setting electrical rates "decided not to promulgate or adhere to a

formal code of procedural rules," and instead followed "informal procedures developed on an *ad*

*hoc* basis as the matter went along." 396 F. Supp. at 1189. The final rate-making decision was

announced "by press release without stating the factors relied on or the underlying reasoning."

*Id.* at 1191. Nonetheless, unlike the Attorney General here, the agency was empowered to set

rates by statute and—in exercising that power—did at least hold a public hearing at which

interested parties were entitled to be heard.  *Id.* at 1190.  Notwithstanding that modicum of

process, the Court found that due process was violated by the agency's "vague and shifting"

procedures, by the lack of an evidentiary record, and by the agency's failure to provide "a

detailed rationale" for its decision.  *Id.* at 1194.  Here, the Attorney General did not provide even

a modicum of legal process, and is imposing his new requirements by simple fiat.

      **B.**     The Attorney General's claim of discretionary authority is particularly offensive

because the Attorney General has, in turn, delegated his "vast" power to self-interested private

parties.  The private nondelegation doctrine, which is an aspect of due process applicable to the

States, forbids the government from "delegat[ing] to private parties the power to determine the

nature of rights to property in which other individuals have a property interest, without supplying

standards to guide the private parties' discretion."  *Gen. Elec. Co. v. New York State Dep't of

Labor*, 936 F.2d 1448, 1455 (2d Cir. 1991).  Such delegation is "delegation in its most obnoxious

form; for it is not even delegation to an official or an official body, presumptively disinterested,

but to private persons whose interests may be and often are adverse to the interests of others."

*Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936); *see also Ctr. for Powell Crossing, LLC v.

City of Powell*, 173 F. Supp. 3d 639, 678 (S.D. Ohio 2016) (citing cases).  The doctrine stands

for the proposition that "[o]nly a government, deriving its powers from the consent of the

governed, may justly establish legal rules of conduct."  *Texas v. United States*, 300 F. Supp. 3d

810, 842 (N.D. Tex. 2018).[21]

---

[21] The *private* nondelegation doctrine is distinct from the nondelegation doctrine, which governs delegations from the executive to the legislative branch of the federal government and generally does not apply to the states.  *See, e.g., Ctr. for Powell Crossing*, 173 F. Supp. 3d at 675–76 (citing cases and tracing origin of the doctrine).

The Attorney General here has violated the private nondelegation doctrine by delegating the power to set rates for medical services to private arbitrators. If nonprofits cannot voluntarily agree to the terms of the compulsory contacts the Attorney General is imposing, the Attorney General has said that they must enter into binding arbitration before private arbitrators who will set the terms and conditions of public access. As discussed above, four of the five arbitration panel members are appointed by market participants with a vested interest in having the insurer prevail; the Attorney General retains no supervision over the arbitrators' decisions; and the Attorney General has set no standards to guide the arbitrators' decision-making—instead providing just a long list of factors with no instruction on how they are to be balanced. See Compl. Ex. A. ¶ 4.3.4. This is an unconstitutional delegation of regulatory power to self-interested private entities; indeed, "it is hard to imagine how delegating 'binding' tie-breaking authority to a private arbitrator to resolve a dispute between [a regulator and regulated entity] could be constitutional" as "[n]o private arbitrator can promulgate binding metrics and standards." *Dep't of Transp. v. Ass'n of Am. R.R.*, 135 S. Ct 1225, 1238 (2015) (Alito, J., concurring). The Attorney General cannot assume vast and standardless power over the nonprofit sphere, and he certainly cannot delegate that power to self-interested private entities.

*       *       *

If the right to due process of law means anything, it must mean that the Attorney General can only regulate the nonprofit sector *according to law*. The government has latitude in setting appropriate procedures, and due process does not require the Attorney General to follow any particular rulemaking procedure. *See, e.g.*, *NJ Primary Care Ass'n Inc. v. NJ Dep't of Human Servs.*, 722 F.3d 527, 537 (3d Cir. 2013). But no case allows the Attorney General to set rules through simple fiat, without following any procedure at all. To the contrary, "the Due Process

35

Clause … at its core protects individuals against arbitrary government action." *Kedra v. Schroeter*, 876 F.3d 424, 436 (3d Cir. 2017). To uphold such a power would be to transform our legal system—replacing a system of government under law with a system of government under men. The constitutional guarantee of due process of law forbids such a result.

> **2.    The Attorney General's arbitrary and irrational requirements violate substantive due process.**

The Attorney General's new requirements violate substantive due process as well. Where protected rights are at issue, non-legislative state action stripping those rights violates substantive due process when the action is "arbitrary, irrational, or tainted by improper motive, or is so egregious that it shocks the conscience." *Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 169 (3d Cir. 2006). The "shocks the conscience" test is not a precise standard; its meaning "varies depending upon factual context." *Chainey v. St.*, 523 F.3d 200, 220 (3d Cir. 2008).

Here, UPMC Pinnacle's substantive due process rights have been violated. As discussed above, UPMC Pinnacle has a protected liberty interest in its right *not* to contract. It also has protected property interests in its business and contractual relationships, and in its rights created by federal statutes and regulations.[22] Each of these substantive due process rights are implicated by the Attorney General's arbitrary and irrational new requirements, which irreconcilably

---

[22] Protected property interest are not defined by the Constitution, but by "existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). As an example, "where state law gives people a benefit and creates a system of nondiscretionary rules governing revocation or renewal of that benefit, the recipients have a secure and durable property right, a legitimate claim of entitlement." *Chicago United Indus., Ltd. v. City of Chicago*, 669 F.3d 847, 851 (7th Cir. 2012). As explained throughout this brief, all the Plaintiffs rely on both state and federal regulations that govern healthcare services and insurance products. These regulations in effect create benefits that are protected property interests under the due process clause.

conflict with the standards that the Attorney General announced less than three years ago and used against some of the very same Plaintiffs—including in litigation before this very Court—in order to block a merger that would have benefited thousands of Pennsylvania residents.

The Attorney General Office's expressed its position on forced contracting and the circumstances necessary for competitive healthcare markets in testimony before the Pennsylvania House of Representatives in October 2014. There, James A. Donahue III, the current Executive Deputy Attorney General of the Public Protection Division, testified as follows with respect to UPMC and an insurer in Western Pennsylvania, Highmark Inc.:

> The simple question we faced was could we force UPMC and Highmark to contract with each other? We concluded that we could not for several reasons…. [including that] the contracting process involves two parties willingly coming to an agreement. By us trying to force the parties to enter into an agreement we would be putting our finger on the scale so to speak and having effects that we aren't quite sure what those effects would be. And in particular we wouldn't be sure about what the price effects that we would impose would be. In contract negotiations one of the key things is that each party has the ability to walk away from the negotiations. That ability to walk away forces each side to be reasonable in most circumstances, putting our finger on the scale in favor of one side or the other changes that dynamic in ways that are unpredictable.

Compl. Ex. E, at 35.

The Attorney General then used that precise argument in successful litigation against UPMC Pinnacle. Prior to joining UPMC, UPMC Pinnacle (then known as "PinnacleHealth") sought to merge with Penn State Hershey Medical Center ("Hershey"), another hospital system operating in the same geographic area. In this Court, the Attorney General, along with the Federal Trade Commission, sought to enjoin the Pinnacle-Hershey merger, arguing that the rivalry between Hershey and PinnacleHealth benefited patients with "lower healthcare costs and increased quality of care," and that the merger would have eliminated "significant head-to-head competition between Hershey and PinnacleHealth." Compl. Ex. C, at 3 ¶ 3.

Critical to the Attorney General's argument was that the merger between PinnacleHealth and Hershey would have reduced leverage in the local market because insurers would no longer be able to walk away from negotiations with the merged health system, and thus insurers would be forced to accept unreasonably high prices. As the Attorney General noted, "a large health plan that serves the Harrisburg Area recently resisted rate increases proposed by Pinnacle by threatening to exclude Pinnacle from its network…. This threat resulted in Pinnacle accepting a more modest rate increase then it had demanded." *Id.* at 23 ¶ 56. If insurers could not threaten to exclude the combined Pinnacle-Hershey system, they could not "use competition … to negotiate better reimbursement rates." *Id.*

The Court entertained a five-day hearing—entailing testimony from dozens of witnesses and thousands of pages of exhibits—and ultimately found that the proposed merger would benefit the public interest. The Attorney General then prevailed at the Third Circuit, arguing that leverage in payor-provider contract negotiations was the key to ensuring a competitive market. And, this leverage was entirely a *"function of a party's ability to walk away from the negotiation and refuse to do business with its negotiating partner."* Compl. Ex. D, at 6–7 (emphasis added). The Third Circuit accepted the Attorney General's arguments and evidence about "the increase in the Hospitals' bargaining leverage" and directed the Court to preliminarily enjoin the merger, which collapsed shortly thereafter. *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 346 (3d Cir. 2016).[23]

---

[23]Among the primary reasons for the merger would have been to relieve the significant capacity restraints on Hershey. Hershey has a high degree of specialization and a national reputation, resulting in significant demands for its services. Hershey, however, lacks the physical space to care for these patients. Due to capacity problems, Hershey frequently has to close its doors to new patients. Hershey and PinnacleHealth sought to optimize capacity utilization across their campuses, with PinnacleHealth receiving more low-acuity care patients, thus creating more room for high-acuity care at Hershey. Hershey has battled *for years* to relieve

Now, however, the Attorney General is taking the exact opposite position and, once again, threatens court intervention as a way of coercing UPMC Pinnacle into following his new requirements.  Despite having argued the exact opposite in blocking the Pinnacle-Hershey merger, the Attorney General now proclaims that it is *against the law* for UPMC Pinnacle to refuse to contract with any insurer.  This irrational new requirement has the effect of *eliminating* the very competition that the Attorney General previously cited as the reason to enjoin the Pinnacle/Hershey merger.  These "irreconcilably inconsistent" legal positions amount to a perversion of the judicial process*.  See, e.g., New Hampshire v. Maine,* 532 U.S. 742, 755 (2001); *Scarano v. Cent. R. Co. of N. J.*, 203 F.2d 510, 513 (3d Cir. 1953) (stating that, in the context of judicial estoppel, parties should not be permitted to assume inconsistent legal positions because "playing fast and loose with the courts" is "an evil [that] the courts should not tolerate").

It is clear that the Attorney General's irreconcilably inconsistent positions have been taken in bad faith.  The Attorney General is disavowing the positions successfully argued to this Court and the Third Circuit, acting contrary to his previously espoused positions about what competition and the public interest require, and intervening in a high-profile matter solely to advance his own political goals.  No other explanation makes sense.  Regardless, the Attorney General's new requirements are so inconsistent—and so arbitrary and irrational—that they shock the conscience.  This Court should not allow UPMC Pinnacle to once again be irreparably

---

its capacity restraints, a challenge that continues to this day.  *See, e.g.*, Lancaster Online, *Expansion could increase Hershey Medical Center capacity by up to 15 percent* (Apr. 21, 2017), https://lancasteronline.com/news/local/expansion-could-increase-hershey-medical-center-capacity-by-up-to/article_e9d78784-2600-11e7-bd3d-6334729f1421.html.

harmed by the Attorney General's contradictory, arbitrary, and fundamentally irrational standards that implicate UPMC Pinnacle's rights under the due process clause.

### 3. The Attorney General's forced contracting violates the unconstitutional conditions doctrine.

The unconstitutional conditions doctrine also prohibits the Attorney General from conditioning nonprofit tax-exempt status on the willingness to abandon federal rights and comply with his new requirements. That doctrine is based on two Supreme Court cases—*Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), and *Dolan v. City of Tigard*, 512 U.S. 374 (1994)—both of which involved the government using coercion to extract public access to private property. The same principle forbids the Attorney General's actions here.

A. Under the unconstitutional conditions doctrine, the government cannot condition a benefit on an agreement to give up constitutionally protected rights. *See, e.g.*, *Koontz v. St. John's River Water Management Dist.*, 570 U.S. 595, 604–05 (2013). Thus, in *Nollan*, the Court found a violation of the doctrine where the government conditioned a building permit on the grant of a public easement to access the beach, 483 U.S. at 830, and in *Dolan* the Court found a violation where the government conditioned a building permit on the grant of an easement to use the property for recreation, 512 U.S. at 394. And while those cases involved building permits, the doctrine is not so limited. Courts hold, for instance, that an agreement to settle an enforcement action is a benefit that can trigger the doctrine. *See, e.g.*, *Stephens v. Cty. of Albemarle*, No. 04-cv-81, 2005 WL 3533428, at *6 (W.D. Va. Dec. 22, 2005); *La. Pac. Corp. v. Beazer Materials & Servs., Inc.*, 842 F. Supp. 1243, 1251 (E.D. Cal. 1994).

Here, the Attorney General has violated the unconstitutional conditions doctrine by conditioning a benefit on broad public access to nonprofits' goods and services. Specifically, the Attorney General has conditioned his willingness *not* to pursue revocation of nonprofits' tax-

exempt status—a benefit worth many millions of dollars—on nonprofits' agreement to provide

their services to all who ask.  *See generally* McGough Decl.  These demands, which take away

the ability of nonprofits to choose *not* to provide services when they conclude that doing so

would be inconsistent with their charitable mission, are "not a valid regulation … but an out-and-

out plan of extortion," *Nollan*, 483 U.S. at 837, under which nonprofits' "right to exclude would

not be regulated, [but instead] would be eviscerated," *Dolan*, 512 U.S. at 394.

Indeed, there is no question that, absent the Attorney General's actions, nonprofits would

have the right *not* to contract to provide their goods and services.  As explained *supra*, federal

law secures the right of nonprofit healthcare providers and insurers to refuse to contract both

under the Medicare Act and ERISA.  Likewise, state law "affirms the right of any health care

insurer, fraternal benefit society or purchaser to … [i]ssue or administer policies or subscriber

contracts in this Commonwealth that provide for reimbursement for services only if the services

have been rendered by a provider or physician who has entered into an agreement with the

insurer or purchaser."  40 Pa. Stat. Ann. § 764a; *see also Torretti*, 580 F.3d at 173 (recognizing

as a matter of Pennsylvania law that "[t]here is no general common-law duty for hospitals to

accept and treat all individuals").  Narrow networks are common—indeed, provider Plaintiffs are

themselves excluded from a variety of insurance networks in the Commonwealth.  State law not

only includes provisions that reflect the existence of these narrow networks.  *See, e.g.*, 40 Pa.

Stat. Ann. § 991.2116 (governing out-of-network services); *id.* § 991.2703 (same).  As noted

above, moreover, this right not to contract also has a constitutional dimension, as a corollary of

the right to contract.  The Attorney General violates the unconstitutional conditions doctrine

when he conditions nonprofit status on an agreement to give up this right.

41

**B.**      In *Nollan* and *Dolan*, the Supreme Court emphasized that the public access being extracted as a condition would amount to a taking if imposed directly.  *See* 483 U.S. at 834; 512 U.S. at 384.  Application of the unconstitutional conditions doctrine is particularly appropriate in that context, as "[e]xtortionate demands of this sort frustrate the Fifth Amendment right to just compensation, and the unconstitutional conditions doctrine prohibits them." *Koontz*, 570 U.S. at 605.  The same is true here, as the Attorney General's demand of public access amounts to a regulatory taking.

Under *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978), the existence of a regulatory taking depends upon (1) the economic impact of the government's action, (2) the extent of interference with investment-backed expectations, and (3) the character of the action.  Each of those factors weighs in favor of finding a taking here.

*First*, the Attorney General's mandate imposes significant costs.  Taking away the right of nonprofit healthcare providers *not* to contract, or to include in their contracts the right to provider-based billing, would impose enormous costs—as it would effectively destroy the ability of those providers to obtain market rates and meet financial requirements.  *See* Rush Decl. ¶¶ 7–14; Pugh Decl. ¶¶ 12–21; McGough Decl. ¶¶ 15–20; *see also Cienega Gardens v. United States*, 331 F.3d 1319, 1340 (Fed. Cir. 2003) ("serious financial loss" may give rise to a regulatory taking).  That cost could have potentially disastrous impacts on nonprofits—and particularly smaller nonprofits—as the loss of leverage in negotiations could reduce the amount that they are paid for *all* the services that they provide.  *See* sources cited *id.*  And that cost is amplified by the fact that the Attorney General's new requirements will have no impact at all on *for-profit* healthcare providers, who will remain free to negotiate market rates, and who will thus enjoy a significant competitive advantage in the healthcare market.

42

*Second*, these costs would also interfere with Plaintiffs' reasonable expectations and the business decisions they have made based on those expectations. Nothing in Pennsylvania nonprofit laws suggests that nonprofit tax status can be conditioned on a willingness to provide services to all who seek them. And, as for the nonprofit healthcare sector specifically, state and federal law reflect a regime of closed networks that is fundamentally at odds with the regime of forced contracts that has been adopted by the Attorney General. Plaintiffs reasonably expected that the Attorney General would follow the law, and Plaintiffs made investment in facilities, equipment, and personnel based on that expectation. *See*, *e.g*., Rush Decl. ¶ 16; *see also Cienega Gardens*, 331 F.3d at 1347 (finding a regulatory taking where plaintiffs "bought their property and entered into contracts in reliance on a different regulatory regime").

*Finally*, the "character" of the Attorney General's actions supports a finding that a taking has occurred. This is not a limited adjustment of the benefits and burdens of economic life; it is a radical change that would allow the Attorney General to take over the State's nonprofit sphere. *See Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440, 448 (2005) (plaintiff stated taking claim based on government takeover of airport security industry). Until now, nonprofits have been free to determine their own mission and pursue it in the manner they feel best, but the Attorney General is replacing that with a system of all-encompassing government management. This unprecedented takeover of an entire sector of the economy amounts to a regulatory taking, and the Attorney General's demand that nonprofits accede to his new requirements as a condition of nonprofit status accordingly violates the unconstitutional conditions doctrine.

### 4. The Attorney General's *ad hoc a*pproach to regulation violates equal protection.

The *ad hoc* approach adopted by the Attorney General also violates equal protection, as it subjects nonprofits to different obligations based on nothing more than whether the Attorney

43

General has chosen to take them into his aim.  For while the Attorney General has said that his new requirements apply to *all* nonprofits, he has also said that right now he is only applying them to UPMC-affiliated entities.  *See* McGough Decl. Ex. D.  The Attorney General's arbitrary decision to subject Plaintiffs and their affiliates to special regulatory burdens violates equal protection.

"[T]he purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  Courts recognize a category of equal protection violations termed "class of one" violations, which are "predicated on the notion that a plaintiff was treated differently by the government, not based on membership in a protected class, but simply arbitrarily." *Southersby Dev. Corp. v. Borough of Jefferson Hills*, 852 F. Supp. 2d 616, 627 (W.D. Pa. 2012).  In addition, the Supreme Court has recognized that executive action untethered from any legal standard can give rise to an equal protection violation, as the exercise of *ad hoc* decision-making may "systematically produce[ ] dramatic differences" in the treatment of similarly-situated entities.  *Allegheny Pittsburgh Coal Co. v. Cty. Comm'n of Webster Cty.*, 488 U.S. 336, 341 (1989).

The Attorney General's exercise of his "vast authority" to single out UPMC-affiliated entities like Plaintiffs for special regulatory burdens violates equal protection.  Other healthcare nonprofits are similarly situated in all relevant respects—as they also are registered as nonprofits and provide care through narrow networks—and yet have not been targeted.  *See Southersby*, 852 F. Supp. 2d at 628 ("[T]he law in the Third Circuit does not require [a plaintiff] to show that the other [entities] are identical in all relevant respects but only that they are alike.").  And the

Attorney General has identified no reason why UPMC-affiliated entities should be subject to burdens that do not apply to these other nonprofit healthcare providers; to the contrary, the Attorney General has *said* that his new requirements apply to all nonprofits, even though he is actually applying them only to the UPMC-Highmark relationship.  *See* Compl. Ex. A; *see also* McGough Decl. Ex. D.  This arbitrary difference in treatment triggers the Equal Protection Clause, as "the specter of arbitrary classifications is fairly raised" where "it appears that [a plaintiff] is being singled out."  *Southersby*, 852 F. Supp. 2d at 627.  The Equal Protection Clause has "come to be understood to protect individuals against purely arbitrary government classifications," *Geinosky v. City of Chicago*, 675 F.3d 743, 747 (7th Cir. 2012), and is violated by the Attorney General's standardless and arbitrary power grab in this case.

## II.    Plaintiffs Will Suffer Irreparable Injury In The Absence Of An Injunction.

Injunctive relief is also necessary to prevent irreparable harm.  As explained above, *supra* pp. 9–10, Plaintiffs face ongoing regulatory deadlines set by federal regulators, and Plaintiffs will be unable to meaningfully project costs without the clarity they are seeking by filing this case.  If this Court does not provide some form of preliminary relief, the resulting regulatory uncertainty will upend Plaintiffs' business and the healthcare insurance market as a whole.

The injuries to Plaintiffs' constitutional rights alone establish irreparable harm as a matter of law.  In *NCAA v. Christie*, the Court permanently enjoined as preempted a state wagering law, holding that "enactment of the [state] Law in violation of the Supremacy Clause, alone, likely constitutes an irreparable harm."  926 F. Supp. 2d 551, 578 (D.N.J. 2013).  Likewise, due process and other "[v]iolations of a litigant's constitutional rights constitute 'irreparable harm' per se."  *N. Pa. Legal Svcs., Inc. v. County of Lackawanna*, 513 F. Supp. 678, 685 (M.D. Pa. 1981) (granting preliminary injunction).  "When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."  *La.*

*Seafood Mgm't Council, Inc. v. Foster*, 917 F. Supp. 439, 442 n.1 (E.D. La. 1996); *see also Baskin v. Bogan*, 12 F. Supp. 3d 1137 (S.D. Ind. 2014) ("It has been repeatedly recognized by federal courts at all levels that violation of constitutional rights constitutes irreparable harm as a matter of law.") (marks and citations omitted)); *Lewis v. Del. State College*, 455 F. Supp. 239, 251 (D. Del. 1978) (same).

The Supremacy Clause violations at issue here also put Plaintiffs in the impossible position of being subject to two conflicting legal regimes. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding injunctive relief available where "respondents were faced with a Hobson's Choice" between acquiescing to a law they believed to be preempted by federal standards and violating the law under pain of liability). For instance, on a daily basis, UPMC Pinnacle and UPMC Somerset submit provider-based billing to various insurers that seeks to recoup the hospitals' cost of providing the physical and other resources necessary to treat patients. Federal regulations allow them to do so for Medicare purposes. Plaintiffs now must decide whether to continue to follow federal law and thereby violate the Attorney General's new requirements, or to comply with those requirements and thereby forego the benefits of their federal rights. Forcing Plaintiffs to make such a choice is "the type of Hobson's choice that the Supreme Court … found to support irreparable harm for purposes of granting injunctive relief." *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (marks and citations omitted), *appeal dismissed*, 2018 WL 3475491 (3d Cir. July 6, 2018).

The imminent irreparable harm goes beyond the constitutional rights at stake. The Attorney General's new requirements will upend how healthcare operates. Plaintiffs will be forced into innumerable contracts over their objection, at times they cannot predict, with no right to terminate without cause, and at rates forced upon them by biased arbitrators. As noted *supra*,

pp. 9–10, UPMC Health Plan will be unable to reliably forecast its costs in order to support the

premium rates and other plan designs that it must submit for regulatory approval in the coming

weeks.  Those submission deadlines are mandatory, meaning that without injunctive relief,

UPMC Health Plan has no choice but to set rates without any of the information—provider

network, reimbursement rates, expected utilization—needed to do so reliably.  Meanwhile,

providers will be stripped of their right to charge the fees established to help cover their

overhead.  And all Plaintiffs will, as a result, lose competitive advantage to their for-profit

counterparts, which are exempt from the Attorney General's requirements.  *See Bracco*

*Diagnostics, Inc. v. Shalala*, 963 F. Supp. 20, 29 (D.D.C. 1997) (finding that loss of competitive

advantage would inflict irreparable injury).

 None of this can be remedied if relief waits until after final judgment.  As the Third

Circuit holds, even monetary loss is irreparable for purposes of injunctive relief where a plaintiff

"would not be entitled to receive those funds back if [state law] is later found to be

unconstitutional, due to state sovereign immunity."  *N.J. Retail Merchants Ass'n v. Sidamon-*

*Eristoff*, 669 F.3d 374, 388 (3d Cir. 2012); *see also Temple Univ. v. White*, 941 F.2d 201, 215

(3d Cir. 1991) ("As to the inadequacy of legal remedies, the Eleventh Amendment … clearly

establishes that any legal remedy is unavailable.").  Only through interim injunctive relief can

Plaintiffs avoid this otherwise irreparable harm.

 Nor can this regulatory uncertainty be cured in state enforcement actions filed by the

Attorney General, as the Attorney General will surely maintain.  While the Attorney General has

taken preliminary steps to enforce his new requirements against UPMC by modifying a consent

decree involving UPMC and Highmark, that action is at once *narrower* and *broader* than this

dispute.  That dispute is narrower inasmuch as the Attorney General has sought to force UPMC

47

to open its doors to a certain subset of insurers and providers (*i.e.*, those who agree to accept terms imposed by the Attorney General's arbitrators) but has not said how UPMC should meet its supposed obligation to provide open access to *other* insurers and providers.  And that dispute is also broader insofar as the Attorney General has pursued a host of other claims against UPMC, including an unfounded challenge to UPMC's nonprofit status.  Plaintiffs have filed this suit because their rights and obligations under federal law must be conclusively settled by the federal courts, and preliminary relief is required to provide the necessary clarity now.

## III.    All Other Factors Favor Injunctive Relief.

Plaintiffs here seek only to continue the *status quo* under existing law and to enjoin the Attorney General from interfering with this area of ongoing federal regulation as Plaintiffs work to comply with upcoming federal regulatory deadlines.  Absent this Court's timely intervention, the Attorney General would upend an industry that touches the life of every single Pennsylvanian in contravention of the policy decisions of Congress and governing federal laws, and without any input from legislators, regulators, or the healthcare industry itself.  The balance of harms and the public interest thus further militate in favor of injunctive relief.

### A.    The Balance Of Hardships Favors An Injunction.

The balance of hardships also favors an injunction.  Plaintiffs and other nonprofit healthcare entities will suffer serious and lasting harm if the Attorney General's takeover of the nonprofit sector is allowed to interfere with the ongoing operation of these federal healthcare programs.  In contrast, no harm at all comes from preliminarily enjoining the takeover.  Preliminary relief does nothing more than preserve the *status quo* and let nonprofit healthcare continue just as the General Assembly, the Governor's office, the Pennsylvania Insurance Department, the Pennsylvania Department of Health, and even the Attorney General (under a different administration) all agreed it should.  If an injunction is granted, "[t]he only hardship

imposed upon the Defendants is that they obey the law," which, of course, is properly viewed as no hardship at all.  *NCAA*, 926 F. Supp. 2d at 578.

The rights at issue confirm that the balance of harms favors an injunction.  The Attorney General has no legitimate interest in violating Plaintiffs' statutory and constitutional rights.  *See Retail Merchants Ass'n*, 669 F.3d at 388–39 ("Granting the preliminary injunction would not result in a greater harm to the State because the State does not have an interest in the enforcement of an unconstitutional law.") (marks omitted)).  And that is particularly true where, as here, the Attorney General does not have a plausible claim that his actions are authorized by state legislation or regulation, and instead seeks to impose his will on an *ad hoc* basis through threats and pressure tactics.  The Attorney General has no possible interest that would favor proceeding with his nonprofit takeover prior to a determination of the significant constitutional and statutory claims at issue in this case.

**B.      An Injunction Is In The Public Interest.**

The public interest also favors preliminarily enjoining the Attorney General's new requirements for nonprofits in Pennsylvania.  For instance, courts uniformly hold that "the public interest [is] not served by the enforcement of an unconstitutional law."  *Retail Merchants Ass'n*, 669 F.3d at 389.  There is no public interest in allowing the Attorney General to run roughshod over the constitutional and statutory rights of nonprofits.

That is particularly true where matters of preemption arise.  "[T]he public interest is served in ensuring that congressional regulation of interstate commerce supercedes conflicting and contradictory state regulations."  *Coal. of N.J. Sportsmen v. Florio*, 744 F. Supp. 602, 608 (D.N.J. 1990); *see also Kennecott Corp. v. Smith*, 637 F.2d 181, 190 (3d Cir. 1980) (public interest served by preventing enforcement of preempted law).  When state officials threaten federal rights, there is no question that it is the appropriate role and duty of the federal courts to

enforce compliance with federal law: "where the federal interest is so strong that it preempts state law, there will rarely be a state interest sufficient to justify a federal court's decision to abstain from its 'unflagging obligation' to exercise its jurisdiction." *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 307 (3d Cir. 2004); *see also Ford Motor Co. v. Ins. Com'r*, 874 F.2d 926, 934 (3d Cir. 1989).

Finally, critical matters of public healthcare hang in the balance. Prior to the Attorney General's unprecedented takeover, the healthcare system in Pennsylvania was operating as Congress, the General Assembly, CMS, the Pennsylvania Departments of Health and Insurance, and even the Attorney General's office (under a prior administration) all intended. That reflects the public interest, and that status quo should be preserved through preliminary injunctive relief. Otherwise, the resulting regulatory uncertainty will have downstream impacts on the consumers who rely on nonprofit healthcare. Insurance markets cannot operate effectively without clear legal rules to allow participants to project costs and set rates. Providers like Plaintiffs contribute billions of dollars to their communities in charitable care and other community benefits. Those levels cannot be sustained when the Attorney General is inflicting severe revenue cuts by stripping nonprofits of their federal rights and forcing mandatory contracts. This Court should preliminarily enjoin the Attorney General's lawless action, preserve the *status quo* pending resolution of Plaintiffs' claims on their merits, and prevent the Attorney General's unilateral healthcare reform and violations of governing federal law.

## CONCLUSION

If this Court does not act, federal regulation of the healthcare industry will be cast aside, replaced with *ad hoc* decrees handed down by state officials in a manner that violates any notion of due process. This derogation of federal law will cause Plaintiffs to suffer harm that can never be undone. Plaintiffs' Motion for a Preliminary Injunction should be granted.

Dated:  February 21, 2019

Respectfully submitted,

 /s/ *Leon F. DeJulius Jr.*
Leon F. DeJulius Jr. (Pa. No. 90383)
*(pro hac motion to be filed)*
Anderson T. Bailey (Pa. No. 206485)
*(pro hac motion to be filed)*
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA  15219
Ph: (412) 391-3939
Fx: (412) 394-7959
lfdejulius@jonesday.com
atbailey@jonesday.com

David S. Torborg
*(pro hac motion to be filed)*
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001-2113
Ph: (202) 879-5562
Fx: (202) 626-1700
dstorborg@jonesday.com

Stephen A. Cozen (Pa. 03492)
James R. Potts (Pa. 73704)
Stephen A. Miller (Pa. 308590)
Jared D. Bayer (Pa. 201211)
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Ste. 2800
Philadelphia, PA 19103
Ph: (215) 665-2000
Fx: (215) 701-2055

*On behalf of Plaintiffs and All*
*Other Members of the Plaintiff Class*