**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UPMC PINNACLE *et al.*, | : | 1:19-cv-00298 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| JOSHUA D. SHAPIRO, in his official | : | |
| capacity as Attorney General of the | : | |
| Commonwealth of Pennsylvania, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM AND ORDER

April 24, 2019

Presently pending before the Court is Defendant Joshua D. Shapiro's motion to dismiss the complaint filed by Plaintiffs UPMC Pinnacle and several of its affiliated entities (collectively, "UPMC"). (Doc. 36). Defendant's motion to dismiss has been fully briefed, (Docs. 42, 51, 56, 57-1), and is ripe for disposition. For the reasons that follow, Defendant's motion shall be granted, and the complaint shall be dismissed without prejudice.

## I.  BACKGROUND

In accordance with the standard of review applicable to a motion to dismiss, the following facts are derived from Plaintiffs' complaint, "documents that are attached to or submitted with the complaint . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public

record, orders, [and] items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (internal citation omitted).

After years of "acrimony," the Pennsylvania Office of the Attorney General ("OAG") facilitated a consent decree between UPMC and Highmark Health under the supervision of the Commonwealth Court ("2014 Consent Decree"). *Commonwealth ex rel. Kane v. UPMC*, 129 A.3d 441, 448 (Pa. 2015). Relevant to the instant action, the 2014 Consent Decree included a modification provision which stated that, if any of the parties believed "that modification of this Consent Decree would be in the public interest, . . . [and i]f the parties cannot agree on a modification, the party seeking modification may petition the Court for modification and shall bear the burden of persuasion that the requested modification is in the public interest." Memorandum and Order, *Commonwealth v. UPMC*, No. 334 MD 2014, slip op. at 27 (Pa. Commw. Ct. April 3, 2019) (emphasis removed). The 2014 Consent Decree also stated that the Commonwealth Court would retain jurisdiction over the matter for the duration of the decree's existence "to enable any party to apply to [the Commonwealth Court] for such further orders and directions as may be necessary and appropriate for the interpretation, modification, and enforcement of this Consent Decree." *Id.* (emphasis removed). The 2014 Consent Decree is set to expire on June 30, 2019. *Commonwealth v. UPMC*, 188 A.3d 1122, 1124 (Pa. 2018).

In November 2018, Pennsylvania Attorney General Joshua D. Shapiro ("Defendant" or "General Shapiro") invited representatives from UPMC to his office in Harrisburg. At the meeting, General Shapiro "asserted that he has 'vast authority' over all Pennsylvania nonprofit entities" and that he intended to implement various changes to how Pennsylvania nonprofit health insurers and healthcare providers like UPMC operate. (Doc. 1 at ¶ 27). On December 14, 2018, Executive Deputy Attorney General James Donahue III sent UPMC an outline of the changes General Shapiro envisioned, framed as proposed modifications to the 2014 Consent Decree. (Doc. 1-3). The document was titled *Modified Consent Decree* and bore the same caption as the 2014 Consent Decree. (*Id.*). In a cover letter accompanying that document, Executive Deputy General Donahue stated that, "[i]f we reach agreement with you on a modified consent decree, we will announce that the consent decree embodies the principles we expect to apply to all nonprofit charitable health systems." (Doc. 3-3). This was concerning to UPMC because, at the November meeting, General Shapiro informed UPMC that "[n]on-compliance [with his proposed changes] would constitute a violation of Pennsylvania nonprofit laws." (Doc. 1 at ¶ 27). Furthermore, because UPMC is obligated to submit its insurance-policy offerings to various regulatory agencies for approval well before those policies become active, General Shapiro's remarks injected a fear that UPMC would be obligated to

adjust its policies to comply with General Shapiro's intended changes, even if UPMC's policies had already been approved by federal regulators—and implemented for consumers—and even if the Commonwealth Court refused to accept General Shapiro's proposed modifications to the 2014 Consent Decree. (Doc. 51 at 6–7).

On December 20, 2018, UPMC sent Executive Deputy General Donahue a series of questions concerning General Shapiro's proposed modifications to the 2014 Consent Decree. UPMC noted, "[w]e have been working diligently to determine UPMC's position on the proposal set forth in your letter of December 14 and want to provide you with several questions that we have about that proposal." (Doc. 3-5 at 1). Throughout their questions, UPMC consistently referenced the "proposed Modified Consent Decree" and the "principles" contained therein. (*Id.* at 1–2). Relevant to the instant motion, among other questions, UPMC asked, "[d]oes [General Shapiro] contend that [his] authority over nonprofit charitable health systems supersedes the non-interference provisions of the Social Security Act" and the Employee Retirement Income Security Act's "preemption clause[?]" (Doc. 3-5 at 3). In a letter dated January 2, 2019, Executive Deputy General Donahue responded "yes" to both questions. (Doc. 3-6 at 4–5).

On March 18, 2019, UPMC sent a letter to Deputy Attorney General Keli Neary requesting that General Shapiro stipulate that he "does not have authority

under Pennsylvania law or independent of the modification provision [outlined in the 2014 Consent Decree] to impose the terms set forth in . . . the Proposed Modified Consent Decree" and that certain provisions in "the Proposed Modified Consent Decree . . . are not legally enforceable." (Doc. 51-2 at 1). General Shapiro did not respond to UPMC's request. Relatedly, in connection with the instant motion to dismiss, UPMC sought early discovery and submitted several requests for admissions and interrogatories for General Shapiro to complete related to General Shapiro's authority to implement the changes he envisioned without the Commonwealth Court's approval. Although General Shapiro timely responded to UPMC's requests and interrogatories, UPMC moved to compel additional responses, contending that General Shapiro's responses were "inadequate" and that General Shapiro's invocation of various privileges was "meritless." (Doc. 55 at 6).

On February 7, 2019, General Shapiro filed a petition in the Commonwealth Court to modify the 2014 Consent Decree. (Doc. 1 at ¶ 33). General Shapiro's petition also included a request to extend the 2014 Consent Decree indefinitely. *UPMC*, No. 334 MD 2014, slip op. at 34–35. On February 21, 2019, UPMC filed an answer to General Shapiro's petition in the nature of a motion to dismiss. The matter was fully briefed.

While UPMC's motion to dismiss General Shapiro's petition was pending in the Commonwealth Court, on February 21, 2019, UPMC filed a complaint in this

Court seeking a declaration that General Shapiro's proposed modifications to the 2014 Consent Decree are preempted by the Medicare Act, the Affordable Care Act, the Employee Retirement Income Security Act, and the Sherman Act. UPMC also lodged various constitutional challenges, contending that General Shapiro's intended modifications amount to a regulatory taking and violate the unconstitutional conditions doctrine, equal protection, as well as substantive and procedural due process. (Doc. 1). On the same day, UPMC filed a preliminary injunction seeking several declaratory judgments and seeking to enjoin General Shapiro's efforts. (Doc. 3).

On March 1, 2019, General Shapiro filed a motion to dismiss UPMC's federal complaint, (Doc. 36), and a brief in support thereof on March 15, 2019. (Doc. 42). UPMC filed a brief in opposition on March 25, 2019, (Doc. 51), and General Shapiro filed a Reply on March 29, 2019. (Doc. 56). On April 2, 2019, UPMC requested, and was granted, leave to file a Sur-Reply. (Docs. 57, 58). *Amicus Curiae* Highmark Health filed a brief in support of General Shapiro's motion to dismiss. (Doc. 60).

On March 1, 2019, Dr. Robert B. Sklaroff, MD, filed a motion for permission to intervene. (Doc. 35). On March 25, 2019, the Hospital and Healthsystem Association of Pennsylvania ("HAP") filed a motion to intervene. (Doc. 49). On March 8 and March 27, 2019 respectively, the Court suspended

briefing as to both motions to intervene until disposition of Defendant's motion to dismiss.  (Docs. 39, 53).

On April 3, 2019, the Commonwealth Court sustained in part and overruled in part UPMC's objections to General Shapiro's petition to modify the 2014 Consent Decree.  In short, the Commonwealth Court sustained UPMC's objections as to Count 1 of General Shapiro's petition to the extent that Count 1 sought an indefinite extension of the 2014 Consent Decree.  The Commonwealth Court deferred ruling upon UPMC's other bases to dismiss General Shapiro's petition and, "decline[d] to state with certainty that, at this stage of the proceeding, all the requested modifications are impermissible."  *UPMC*, No. 334 MD 2014, slip op. at 34.

On April 16, 2019, the Pennsylvania Supreme Court granted General Shapiro permission to appeal the Commonwealth Court's order concerning Count 1.  Order, *Commonwealth v. UPMC*, No. 46 MM 2019, slip op. at 1 (Pa. April 16, 2019) (*per curiam*).  The following day, the Commonwealth Court stayed proceedings as to the remaining counts in General Shapiro's petition "to allow the parties to concentrate on the current time-sensitive appeal in the Supreme Court."  Order, *Commonwealth v. UPMC*, No. 334 MD 2014, slip op. at 1 (Pa. Commw. Ct. April 17, 2019).

General Shapiro's motion to dismiss UPMC's complaint before this Court has been fully briefed and is ripe for disposition. For the reasons that follow, General Shapiro's motion to dismiss shall be granted and UPMC's complaint shall be dismissed without prejudice. Because we shall dismiss UPMC's complaint, UPMC's motion for preliminary injunction, (Doc. 3), Dr. Sklaroff's motion for permission to intervene, (Doc. 35), HAP's motion to intervene, (Doc. 49), and UPMC's motion to compel discovery, (Doc. 55), shall be dismissed as moot.

## II.    STANDARD OF REVIEW

In considering a motion to dismiss pursuant to Rule 12(b)(6), courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In resolving a motion to dismiss pursuant to Rule 12(b)(6), a court generally should consider only the allegations in the complaint, as well as "documents that are attached to or submitted with the complaint . . . and any matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." *Buck*, 452 F.3d at 260 (internal citations omitted).

A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirement of Federal Rules of Civil Procedure 8(a). Rule 8(a)(2) requires that a complaint contain a short and plain statement of the claim showing that the pleader is entitled to relief, "in order to give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

While a complaint attacked by a Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, it must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level.'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). In essence, the complaint must indicate that defendant's liability is more than "a sheer possibility." *Iqbal*, 556 U.S. at 678. "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* at 679 (internal quotation marks and citation omitted). "Even on a motion to dismiss, we are not required to credit mere speculation." *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 542 (3d Cir. 2012) (citation omitted).

## III.    DISCUSSION

In his motion, General Shapiro first argues that UPMC's complaint must be dismissed because it is not ripe.  According to General Shapiro, "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  (Doc. 42 at 9 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998))).  In this case, General Shapiro posits, UPMC's claims are predicated upon the Commonwealth Court accepting his proposed modifications to the 2014 Consent Decree.  "Because the Commonwealth Court has not yet ruled on the [merits of the] Petition to Modify and neither party has exhausted its remedies in state court, UPMC's claims simply are 'not ripe for adjudication' [because t]hey 'res[t] upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  (Doc. 42 at 10 (quoting *Texas*, 523 U.S. at 300) (some alterations in original)).  "The Attorney General has not created new principles or requirements.  He has simply asked the Commonwealth Court to grant a petition, something that the court may, or may not, do."  (Doc. 42 at 10).  Until the Commonwealth Court acts, General Shapiro reasons, "he is tasked with *enforcement* of existing laws, not with making new ones."  (Doc. 56 at 3) (italics in original).  Thus, General Shapiro represents, UPMC faces no threat of enforcement (and therefore no ripe controversy) until the

Commonwealth Court accepts his proposed modifications or his intended changes are supported by the force of law.

Likewise, General Shapiro argues, even if the Commonwealth Court agrees to modify the 2014 Consent Decree to include his recommended changes, "no controversy could actually exist unless and until [he] would *seek to enforce* the terms of any Modified Consent Decree against UPMC." (Doc. 42 at 10 (italics in original)). In fact, General Shapiro points out, "UPMC candidly acknowledges that it is too early to know how any such hypothetical enforcement will play out." (*Id*. at 10–11 (citing Doc. 1, ¶¶ 39–40 ("General Shapiro has not yet identified to Plaintiffs what specific actions he intends to take to ensure that his new rules apply to all nonprofits;" "General Shapiro has not yet identified to Plaintiffs what specific actions he intends to take to force Plaintiffs to open their doors to insurers and providers who do not agree to be bound by his arbitration procedures."))). Accordingly, General Shapiro concludes, "UPMC fails to present a ripe controversy for adjudication and the Complaint should be dismissed." (Doc. 42 at 12).

In response, UPMC contends that their claims are ripe for review under the Third Circuit's three-part test for ripeness in the declaratory judgment context. According to UPMC, under the test outlined by our Court of Appeals in *NE Hub Partners*, this Court must consider only: "(1) the adversity of the parties' interests,

(2) the probable conclusiveness of the judgment, and (3) the practical utility of the judgment to the parties." (Doc. 51 at 12 (citing *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 342 (3d Cir. 2001))). UPMC avers that its claims meet all three benchmarks.

First, UPMC reasons, it is "unquestionable" that General Shapiro's interests are adverse to UPMC's. (Doc. 51 at 12). This is so, UPMC avers, even if it has not yet "suffered a completed harm . . . so long as there is a substantial threat of real harm that remains throughout the course of the litigation." (Doc. 51 at 12–13 (quoting *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006))). In this case, UPMC asserts, it faces "imminent government filing deadlines . . . that will lock in premium rates for the coming year. If General Shapiro's new requirements take effect, it will force unanticipated changes to [UPMC's] provider networks and negate all of the work done to accurately set premiums so as to cover costs." (Doc. 51 at 6–7). Accordingly, UPMC reasons, "there is a substantial threat of real harm that remains throughout the course of the litigation" and federal "[c]ourts have thus repeatedly rejected ripeness challenges under circumstances identical to those alleged here" where a complaining party asserts that a state or local governing body intends to enforce an otherwise-federally preempted provision. (*Id.* at 12–13 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992); *Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 523 (3d Cir.

2018); *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006)) (italics omitted)).  In this case, UPMC reiterates, "General Shapiro has announced legal principles for nonprofit healthcare providers that conflict with Plaintiffs' rights under federal law," "[h]e has further made clear that Plaintiffs' status as nonprofits and/or subsidiaries of a nonprofit places them in violation of state law unless they conform to these new requirements," (Doc. 51 at 13–14), and "[t]he Attorney General has contended in correspondence and communications with UPMC, as well as in its claims in the Commonwealth Court, that [UPMC's 2020 insurance] plans will violate state law if they do not include certain providers." (Doc. 61). Thus, UPMC deduces, its interests are adverse to those of General Shapiro, and its claims are ripe for review.

UPMC identifies several of General Shapiro's statements in support of its view that General Shapiro intends to enforce the terms of the proposed modifications to the 2014 Consent Decree even if the Commonwealth Court refuses to so modify the 2014 Consent Decree.  First, UPMC points to General Shapiro's statements at the November 2018 meeting asserting that he has "'vast authority' over all Pennsylvania nonprofit entities," that he intends to implement various changes to how nonprofit health insurance providers like UPMC operate, that "he was preparing a formal list of terms by which all nonprofits must abide," and that "[n]on-compliance would constitute a violation of Pennsylvania nonprofit

laws." (Doc. 1 at ¶¶ 27, 31, 32). Second, UPMC cites General Shapiro's affirmative indication that his "authority over nonprofit charitable health systems supersedes the non-interference provisions of the Social Security Act" and the Employee Retirement Income Security Act's "preemption clause." (Docs. 3-5, 3-6). Third, UPMC cites Executive Deputy General Donahue's cover letter that accompanied the mailed copy of General Shapiro's proposed modifications to the 2014 Consent Decree which stated that "[i]f we reach agreement with you on a modified consent decree, we will announce that the consent decree embodies the principles *we expect to apply to all nonprofit charitable health systems*." (Doc. 3-3 (emphasis added)). Fourth, UPMC cites General Shapiro's failure to respond to its requested stipulation and failure to fully answer the interrogatories and requests for admission concerning General Shapiro's authority to implement his changes absent approval by the Commonwealth Court. Thus, UPMC concludes, General Shapiro's statements and attitude suggest that he intends to act even without the Commonwealth Court's approval and, thereby, he has "present[ed] a substantial threat of sanction" which renders General Shapiro's interests adverse to UPMC's and "makes Plaintiffs' claims for relief ripe." (Doc. 51 at 13–14).

UPMC also posits that its claims meet the second prong of the *NE Hub Partners* test because "a decision in this case would provide conclusive guidance concerning Plaintiffs' rights and obligations under federal law," and because

"[t]his factor is almost always satisfied in preemption cases . . . ." (Doc. 51 at 14).

Likewise, UPMC argues, its claims satisfy the third prong of the *NE Hub Partners*

test because "a decision in this case would have practical utility for the parties,"

inasmuch as "[j]udgment for Plaintiffs in this case will provide certainty that

federal law preempts contrary state regulation." (Doc. 51 at 15).

Finally, UPMC avers, "General Shapiro's evasiveness as to his own intent is

an obvious ploy to avoid federal scrutiny." (Doc. 51 at 15–16). According to

UMPC, "[i]t makes no sense to withhold this Court's review on the mere

possibility that the Attorney General might—or might not—follow . . . constraints

voluntarily." (Doc. 52 at 16). In their Sur-Reply, UPMC also argues that, because

there exists a question of fact as to whether General Shapiro intends to impose new

obligations upon UPMC absent the binding force of the proposed modifications to

the 2014 Consent Decree, and because General Shapiro is otherwise "refusing to

respond to all discovery intended to illuminate that factual dispute," dismissal is

not warranted at this stage. (Doc. 57-1 at 5 (citing *Lincoln Benefit Life Co. v. AEI*

*Life, LLC*, 800 F.3d 99, 111 (3d Cir. 2015)). We disagree.

"A claim is not ripe for adjudication if it rests upon contingent future events

that may not occur as anticipated, or indeed may not occur at all." *Texas v. United*

*States*, 523 U.S. 296, 300 (1998) (internal quotation marks and citations omitted).

This requirement is designed "to prevent the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967).

"Ripeness is a matter of degree whose threshold is notoriously hard to pinpoint." *NE Hub Partners, LP. v. CNG Transmission Corp*., 239 F.3d 333, 341 (3d Cir. 2001). "This is especially so in declaratory judgment actions 'because declaratory judgments are typically sought before a completed injury has occurred.'" *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 190 (3d Cir. 2009) (quoting *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1298 (3d Cir. 1996)).

Despite its opacity, a ripe issue has two fundamental components. First, the "issue" must be "fit" for judicial decision and, second, "the hardship to the parties of withholding court consideration" must equitably favor review. *Abbott Labs.*, 387 U.S. at 149. In further explication of these considerations, the Third Circuit has outlined three non-exhaustive requirements for ripe claims: "(1) the parties must have adverse legal interests; (2) the facts must be sufficiently concrete to allow for a conclusive legal judgment, and (3) the judgment must be useful to the parties." *Surrick v. Killion*, 449 F.3d 520, 527 (3d Cir. 2006) (citing *Step-Saver*

*Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990)); *see also*

*Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 412 (3d Cir. 1992) (finding

that the three *Step-Saver* factors "are not exhaustive of the principles courts have

considered in evaluating ripeness challenges").

"In assessing the adversity of the parties' interest, courts look to '[w]hether

the claim involves uncertain and contingent events, or presents a real and

substantial threat of harm.'" *Surrick*, 449 F.3d at 527 (quoting *NE Hub Partners*,

239 F.3d at 342 n.9). "In the declaratory judgment context, we have refined this

test because of the difficulty in defining ripeness in actions initiated before an

'accomplished' injury is established." *Armstrong World Indus.*, 961 F.2d at 411

(quoting *Step-Saver*, 912 F.2d at 647). "Where the plaintiff's action is based on a

contingency, it is unlikely that the parties' interests will be sufficiently adverse to

give rise to a case or controversy . . . ." *Id*. at 411–12 (citation omitted).

"In addition to having adversity of interest between the parties, any contest

must be based on a real and substantial controversy admitting of specific relief

through a decree of a *conclusive* character, as distinguished from an opinion

advising what the law would be upon a hypothetical state of facts." *Id*. at 412

(quoting *Step-Saver*, 912 F.2d at 649) (internal quotation marks omitted). "A

declaratory judgment granted in the absence of a concrete set of facts would itself

be a 'contingency,' and applying it to actual controversies which subsequently

arise would be an 'exercise in futility.'" *Id.* (quoting *Step-Saver*, 912 F.2d at 648).

Indeed, the Supreme Court has held that "the need for a concrete set of facts" is

"particularly important in cases raising allegations of an unconstitutional taking of

private property." *Id.* (quoting *Hodel v. Virginia Surface Mining & Reclamation*

*Ass'n*, 452 U.S. 264, 294–95 (1981)). "On the other hand, it has indicated that a

factual record is not as important where the question presented is 'predominantly

legal,' such as one of federal preemption." *Id.* (quoting *Pac. Gas & Elec. Co. v.*

*State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983)). "Of

course, even where the need for a concrete set of facts is not as great, the case or

controversy requirement must be met." *Id.*

As an initial matter, we disagree with UPMC's blanket assertion that

"[c]ourts have . . . repeatedly rejected ripeness challenges under circumstances

identical to those alleged here." (Doc. 51 at 13 (citing *Morales v. Trans World*

*Airlines, Inc.*, 504 U.S. 374 (1992); *Wayne Land & Mineral Grp. LLC v. Delaware*

*River Basin Comm'n*, 894 F.3d 509, 524 (3d Cir. 2018); *Surrick v. Killion*, 449

F.3d 520, 528 (3d Cir. 2006)).

In *NE Hub Partners*, the Third Circuit determined that NE Hub Partners'

claim was ripe even though the regulatory board defendants had not, as of the time

of the litigation, "taken any action" or issued any decision adverse to NE Hub

Partners. *NE Hub Partners*, 239 F.3d at 342–43, 348–49. In short, the Third

Circuit found that the very fact that NE Hub Partners was required to jump through the hoops created by the regulatory board was sufficient to render the parties' interests adverse, even if the regulatory board had not, as of the time of the litigation, issued a final adverse decision. *Id*. at 342–43. The Third Circuit concluded that, although "[c]ourts have found insufficient adversity for ripeness where the chance of the defendant acting against plaintiff is but a 'contingency[,]' . . . there is little doubt that [the regulatory board] will continue with the permit review process, and that the process [of undergoing that permit-review process] itself is the alleged harm." *Id*. at 343.

Similarly, in *Wayne-Land*, the owner of property in the Delaware River Basin sought a declaratory judgment that the Delaware River Basin Commission lacked the authority under the Delaware River Basin Compact to require property owners to apply for and obtain project approval for hydraulic fracturing activities. On appeal, the Third Circuit held that the property owner's and the Commission's legal interests were adverse as a result of the "real and substantial threat of harm" imposed by the Commission's requirement that the property owners submit an application to obtain approval—a process which "will necessarily incur significant expenses and legal risk." *Wayne-Land*, 894 F.3d at 523. Thus, the Court concluded, there was adversity of legal interests which presented a real and

substantial threat of harm and the district court was correct in finding that the property owner's claim was ripe.

In *Surrick v. Killion*, the Third Circuit reviewed the case of an attorney who had been suspended from practicing law in Pennsylvania but nonetheless sought a declaration that he was entitled to open a law office and practice in federal court before the Eastern District of Pennsylvania. In affirming the district court's decision, the Third Circuit noted that there was sufficient adversity of interests between the attorney plaintiff and the Pennsylvania Office of Disciplinary Counsel (and, by consequence, that the matter was ripe) because the Office of Disciplinary Counsel was bound by Pennsylvania Supreme Court precedent which had definitively ruled that "an attorney who has been suspended from the practice of law by the Pennsylvania Supreme Court may [not] maintain a law office in the Commonwealth of Pennsylvania for purposes of practicing before the United States District Court for the Eastern District of Pennsylvania." *Surrick*, 449 F.3d at 527. Thus, the Third Circuit concluded, "the threat of sanctions [wa]s sufficiently real and substantial" because the Office of Disciplinary Counsel's position was clearly dictated by binding law. *Id*. at 528.

In *Morales v. Trans World Airlines, Inc*., the United States Supreme Court reviewed a lawsuit by various airlines seeking to enjoin a consortium of state attorneys general from enforcing state laws regulating airline advertising. In a six-

to-three decision, our Supreme Court affirmed part of the district court's injunction

barring the consortium from enforcing their respective states' advertising laws,

finding the state guidelines preempted by federal law.  Prior to so holding, the

Court addressed whether the airlines had an adequate remedy at law and, by

consequence, whether the district court was authorized to provide injunctive relief.

*Morales*, 504 U.S. at 380–82.  In finding that the district court did have such

authority, the High Court did not address the ripeness of the airlines' claim.

Rather, relying upon *Ex parte Young*, 209 U.S. 123, 156 (1908), the Court held that

"[w]hen enforcement actions are imminent—and at least when repetitive penalties

attach to continuing or repeated violations and the moving party lacks the realistic

option of violating the law once and raising its federal defenses—there is no

adequate remedy at law."  *Morales*, 504 U.S. at 381.  In the airlines' case, the

Court continued, "the attorneys general of seven States, including petitioner's

predecessor, had made clear that they would seek to enforce the challenged

portions of the guidelines (those concerning fare advertising) through suits under

their respective state laws."  *Id*.  As such, the Court concluded, the airlines had no

adequate remedy at law, and injunctive relief was appropriate, because "[l]ike the

plaintiff in *Young* . . . respondents were faced with a Hobson's choice: continually

violate the Texas law and expose themselves to potentially huge liability; or violate

the law once as a test case and suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Id*.

Despite finding that the district court was authorized to enjoin the consortium of state attorneys general from acting, the *Morales* Court reasoned that the district court's enjoinder of "any enforcement action" was overbroad. "In suits such as this one, which the plaintiff intends as a 'first strike' to prevent a State from initiating a suit of its own, the prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury." *Id*. at 382. Thus, because the attorneys general had "threatened to enforce only the obligations described in the guidelines regarding fare advertising, the injunction must be vacated insofar as it restrains the operation of state laws with respect to other matters." *Id*. at 382–83. In closing, the Supreme Court reiterated: "*Ex parte Young* . . . speaks of enjoining state officers 'who threaten and are about to commence proceedings' . . . and we have recognized in a related context that a conjectural injury cannot warrant equitable relief . . . . Any other rule (assuming it would meet Article III case-or-controversy requirements) would require federal courts to determine the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its law applicable." *Id*. at 382 (quoting *Ex Parte Young*, 209 U.S. at 156).

In *Armstrong World Industries, Inc. v. Adams*, shareholders of a Pennsylvania corporation challenged the constitutionality of a Pennsylvania anti-takeover statute. The Third Circuit dismissed plaintiffs' claims finding the matter was not ripe. Specifically, the Court held that plaintiffs' claims were contingent upon a takeover attempt triggering the statute at issue and plaintiffs had failed to identify "a single instance" in which the statute was triggered to their detriment. *Armstrong World Indus.*, 961 F.2d at 413.

In this case, and having developed the aforementioned holdings as a backdrop, it is clear that UPMC has failed to cite a single case which supports its broad position that "[c]ourts have . . . repeatedly rejected ripeness challenges under circumstances identical to those alleged here." (Doc. 51 at 13). Unlike in *NE Hub Partners* and *Wayne Land*, UPMC does not allege that simply being subjected to the prospect of modifying the 2014 Consent Decree is the harm they face. *See NE Hub Partners, LP*, 239 F.3d at 343 ("[T]here is little doubt that . . . the process itself is the alleged harm."). In fact, by agreeing to the terms of the 2014 Consent Decree, UPMC agreed to subject itself to the possibility of modification *ab initio*. It cannot now claim that those terms present such a hardship that its interests are adverse to General Shapiro's and that its claims are, therefore, ripe for review.

Unlike in *Surrick*, UPMC has not contended that there exists binding precedent which authorizes General Shapiro to enforce his changes absent a

modification to the 2014 Consent Decree. *See Surrick*, 449 F.3d at 528 (holding that "the threat of sanctions [wa]s sufficiently real and substantial" because the Office of Disciplinary Counsel's position was clearly supported by directly on-point and binding precedent). In fact, General Shapiro has made clear that he is not so authorized. (Doc. 56 at 3 ("[The Attorney General] is tasked with *enforcement* of existing laws, not with making new ones.") (italics in original)).

We are unpersuaded by UPMC's contentions that General Shapiro has suggested through his words, actions, or inactions that he intends to implement his changes using his authority over Pennsylvania non-profit entities even if the Commonwealth Court does not accept his proposed modifications to the 2014 Consent Decree. In our view, even taking UPMC's averments as true—as is our duty at this juncture—UPMC has failed entirely to demonstrate as much beyond speculative and conclusory allegations. *See Iqbal*, 556 U.S. at 679 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement.") (internal quotation marks and citation omitted); *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 542 (3d Cir. 2012) ("Even on a motion to dismiss, we are not required to credit mere speculation."). We address each of UPMC's assertions in this vein *seriatim*.

First, UPMC's reliance upon General Shapiro's statements that he has "'vast authority' over all Pennsylvania nonprofit entities," that he intends to implement various changes to how all nonprofit health insurance providers like UPMC operate, that "he was preparing a formal list of terms by which all nonprofits must abide," and that "[n]on-compliance would constitute a violation of Pennsylvania nonprofit laws" is misguided. (Doc. 1 at ¶¶ 27, 31, 32). Each of these statements was made in the context of General Shapiro's proposed modifications to the 2014 Consent Decree. The same goes for General Shapiro's affirmative indication that his "authority over nonprofit charitable health systems supersedes the non-interference provisions of the Social Security Act" and the Employee Retirement Income Security Act's "preemption clause." (Docs. 3-5, 3-6). That is, General Shapiro only contended as much within the context of the proposed modifications to the 2014 Consent Decree. UPMC acknowledges in its letter wherein these questions were presented to General Shapiro, that "General Shapiro delivered this list of new requirements on December 14, 2018, *in the form of a proposed Consent Decree*." (Doc. 1 at ¶ 28 (emphasis added)). Clearly, the proposed modifications to the 2014 Consent Decree formed the basis of UPMC's interactions with General Shapiro and, thus, UPMC surely must recognize that the modified Consent Decree—if accepted by the Commonwealth Court—would serve as General Shapiro's basis to enforce the principles outlined therein. Indeed, had General

Shapiro believed that he was authorized to act pursuant to Pennsylvania's non-profit laws and did not believe that modifying the 2014 Consent Decree was necessary, we see no reason why he would have petitioned the Commonwealth Court to modify it. It is for this reason that General Shapiro's cover letter accompanying the mailed copy of his proposed modifications to the 2014 Consent Decree stated that, *"[i]f we reach agreement with you on a modified consent decree*, we will announce that the consent decree embodies the principles *we expect to apply* to all nonprofit charitable health systems."  (Doc. 3-3 (emphasis added)).  Clearly, it is not until the Commonwealth Court rules in his favor that General Shapiro "expect[s] to apply" these principles to UPMC, and it is not until that point that General Shapiro could "expect to apply" these principles "to all nonprofit charitable health systems" who may or may not be subject to the 2014 Consent Decree.  (*Id*.).

It is of no moment that the 2014 Consent Decree includes only UPMC and Highmark and does not bind "all nonprofit charitable health systems."  (*Id*.).  To be clear, whether General Shapiro "expect[s] to apply" these principles "to all nonprofit charitable health systems" does not mean that these principles *will* apply "to all nonprofit charitable health systems."  (*Id*.).  General Shapiro's stated expectations cannot support the inference that he is "about to commence proceedings," and, thus, cannot support the inference that UPMC's and General

Shapiro's interests are sufficiently adverse such that UPMC's claims are ripe for review. *See Morales*, 504 U.S. at 382–83.

We are also unpersuaded by UPMC's contention that General Shapiro's failure to respond to its requested stipulation and answer its interrogatories and requests for admission to its own satisfaction support the inference that General Shapiro believes that he is authorized to act upon his stated intentions without the Commonwealth Court's approval and that he is about to "commence proceedings" to enforce his changes. Although, at this juncture, we are obliged to draw all reasonable inferences in favor of UPMC as the nonmoving party, *see Phillips*, 515 F.3d at 231, "[e]ven on a motion to dismiss, we are not required to credit mere speculation." *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 542 (3d Cir. 2012). To hypothesize that General Shapiro's failure to respond amounts to a flat-out refusal (and, therefore, to assume *ipso facto* that General Shapiro believes that he is authorized to act in conformity with the proposed modifications to the 2014 Consent Decree even absent Commonwealth Court approval) is wholly speculative, implausible, and too attenuated to be credited at this juncture. Indeed, drawing such an inference flies in the face of the fact finding and litigation processes wherein there may be countless reasons for not responding to a requested stipulation, both legal and personal. For the same reason, we are not persuaded by UPMC's argument that we must find adversity and ripeness simply because UPMC

believes that General Shapiro's responses to its discovery requests were "inadequate" and that his invocation of various privileges was "meritless." (Doc. 55 at 6).

Accordingly, unlike in *Morales*, General Shapiro has not "made clear that [he] would seek to enforce the challenged" provisions of the proposed modifications to the 2014 Consent Decree absent approval by the Commonwealth Court. Indeed, General Shapiro has clearly stated that "[he] does not and cannot announce new laws, legal principles or legal requirements." (Doc. 56 at 6); *see also Morales*, 504 U.S. at 381. Although UPMC relies heavily upon *Morales* in support of its view, *Morales* does not support UPMC's position. At bottom, *Morales* was predicated upon a consortium of state attorneys general enforcing state laws which had already been reviewed, approved, and passed into law. In this case, the challenged "principles" at issue amount to no more than a politician's intentions, interests, and desires. As noted in *Morales*, "*Ex parte Young* . . . speaks of enjoining state officers 'who threaten and are about to commence proceedings' . . . and we have recognized in a related context that a conjectural injury cannot warrant equitable relief . . . . Any other rule (assuming it would meet Article III case-or-controversy requirements) would require federal courts to determine the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its law applicable." *Morales*, 504 U.S. at 382. In

this case, UPMC has presented only a "conjectural injury" in a "hypothetical situation" in that they have failed to demonstrate that General Shapiro is "about to commence proceedings" or that he has the legal authority to do so. *See id*.

In short, unlike in *NE Hub Partners*, *Wayne-Land*, and *Surrick*, UPMC has failed to show that "the parties . . . have adverse legal interests" and has thus failed to demonstrate that its claims are ripe. Indeed, Defendants tellingly concede, "General Shapiro has not yet identified to Plaintiffs what specific actions he intends to take to ensure that his new rules apply to all nonprofits." (Doc. 1 at ¶ 39). Courts have found insufficient adversity for ripeness where the chance of the defendant acting against plaintiff is but a "contingency." *See Armstrong World Indus.*, 961 F.2d at 413–14 (finding insufficient adversity between state and plaintiffs challenging validity of takeover law, because takeover of plaintiffs was "contingency which may not occur," in which case they would not suffer from law). Thus, even taking all of UPMC's allegations as true that General Shapiro's stated intentions may present a threat of harm —as is our duty at this juncture— UPMC has failed entirely to demonstrate that said threat is "real" rather than "uncertain" or "contingent." *Surrick*, 449 F.3d at 527 (quoting *NE Hub Partners*, 239 F.3d at 342 n.9). "A declaratory judgment granted in the absence of a concrete set of facts would itself be a 'contingency,' and applying it to actual controversies which subsequently arise would be an 'exercise in futility.'" *Armstrong World*

*Indus.*, 961 F.2d at 411–12 (citing *Step-Saver*, 912 F.2d at 647).  Thus, we decline to review UPMC's claim until such time that General Shapiro either acts, or is, at minimum, patently authorized to act under a reasonable reading of a duly passed statute or the common-law.

As a final note, we are unpersuaded by UPMC's position that, because it asserts that there exists a question of fact as to whether General Shapiro intends to impose new obligations upon UPMC and other non-profit healthcare providers without authorization of the Commonwealth Court, and because General Shapiro is otherwise "refusing to respond to all discovery intended to illuminate that factual dispute," dismissal is not warranted at this pleading stage.  (Doc. 57-1 at 5 (citing *Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 111 (3d Cir. 2015))).  As we have already noted, whether General Shapiro *intends* or *hopes to* impose new obligations upon UPMC and other non-profit healthcare providers does not answer the question of whether he actually *has* imposed those obligations or whether he is authorized to do so.  Until the Commonwealth Court agrees to General Shapiro's proposed modifications to the 2014 Consent Decree or until General Shapiro actually acts, General Shapiro's proposed changes constitute no more than his stated intentions.  General Shapiro's stated intentions are not binding law.  Were we to find as much, this Court's docket would be overwhelmed with ripe controversies anytime a politician opened his or her mouth.  Thus, UPMC's claims

are, by definition, contingent and unripe. In the words of famed football quarterback and commentator Don Meredith: "If ifs and buts were candy and nuts, we'd all have a merry Christmas."[1]

## IV.    CONCLUSION

In accordance with the foregoing, Defendant Joshua D. Shapiro's Motion to Dismiss, (Doc. 36), shall be granted.

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. Defendant Joshua D. Shapiro's Motion to Dismiss, (Doc. 36), is **GRANTED**. Plaintiffs' Complaint, (Doc. 1), is **DISMISSED** without prejudice.

2. Plaintiffs' Motion for Preliminary Injunction, (Doc. 3), Robert B. Sklaroff, MD's Motion for Permission to Intervene, (Doc. 35), Hospital and Healthsystem Association of Pennsylvania's Motion to Intervene, (Doc. 49), and Plaintiffs' Motion to Compel Discovery, (Doc. 55), are **DISMISSED** as moot.

3. The Clerk of the Court **SHALL CLOSE** the file on this case.

/s/ John E. Jones III
John E. Jones III
United States District Judge

---

[1]    Because we shall grant Defendant's motion to dismiss based upon ripeness, we decline to address Defendant's other bases for dismissal.